Pages 1 - 45

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

LAM RESEARCH CORPORATION,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           ) NO. C 03-1335 EMC
                                 )
SCHUNK SEMICONDUCTOR, et al,     )
                                 )  San Francisco, California
            Defendants.          )  Tuesday
                                 )  February 11, 2014
_____)  2:30 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**For Plaintiff:**          CARR & FERRELL, LLP
                            120 Constitution Drive
                            Menlo Park, California 94025
                     BY:  **STUART CLARK, ESQ.**
                          **BRYAN  BOYLE, ESQ.**


**For Defendants:**         SHAUB WILLIAMS, LLP
                            12121 Wilshire Boulevard
                            Suite 205
                            Los Angeles, California 90025
                     BY:  **DAVID SHAUB, ESQ.**
                          **LISBETH MERRILL, ESQ.**
                          **CASSANDRA TAM, ESQ.**


**Also Present:**           **Eric Janofsky, Esq**.
                            Lam Research Corporation


*Reported By:*    *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                  *Official Reporter - US District Court*
                  *Computerized Transcription By Eclipse*

P R O C E E D I N G S

**February 11, 2014**                                        2:38 p.m.

THE CLERK:  C 03-1335, Lam Research versus Schunk Semiconductor.

Counsel, please come to the podium and state your name for the record.

MR. CLARK:  Good afternoon, your Honor.  Stuart Clark of Carr and Ferrell appearing for Lam Research Corporation, the plaintiff.

With me, your Honor, is my colleague Brian Boyle and in-house counsel for Lam, Eric Janofsky.

THE COURT:  Good afternoon.

MR. SCHAUB:  Good afternoon, your Honor.  David Schaub appearing for the defendant Xycarb.

I have with me today Lisbeth Merrill, one of the attorneys in our firm, and, also, Cassandra Lam, one of the attorneys in our firm.

THE COURT:  Great.  Thank you.

Good afternoon everyone.  We're here for a tutorial.  I think I have a sense after reading some of the materials, but maybe you can help me understand exactly what it is we're dealing with.

I don't know if you have anything besides the usual diagrams that are attached to the patent, which are not the easiest to ascertain.  If you have something -- I don't know if

you have anything physical to look at?

MR. CLARK:  Yes, your Honor.  Also, on our side is Dr. Alexander Glew.  He is a mechanical and materials engineer with a PhD from Stanford.  He is in private practice as a consulting engineer.  Previously worked in industry for companies, such as Applied Materials.

I think we probably agree that both of our experts are qualified.  I see Dr. Lin is here for the other side.  I assume he's going to be presenting for them.

Dr. Glew has -- we have a PowerPoint to try and track you through the presentation and Dr. Glew is available to present our tutorial.

MR. SCHAUB:  Yes.  And on our side, your Honor, we hope we can clarify matters for you.  We have Dr. Lin here as well, as just mentioned, who is going to contribute to the dialogue.

And, in addition, what would like to do and plan on doing is to have Ms. Merrill make the presentation when it's our turn.  Then Cassandra Tam is going to assist her in that presentation.  And Dr. Lin may be called upon to explain certain aspects of the presentation.

The other thing I wanted to ask the judge is how much time is available to us this afternoon so we can plan ahead?

THE COURT:  Well, let's make clear.  This is not the claim construction hearing.  I don't want to hear a lot of

arguments.

MR. SCHAUB:  I understand.

THE COURT:  And from what I can see, I mean, this is -- doesn't seem all that complicated, but I -- you know, but I do want to hear you, but I wouldn't think this would, you know, take more than -- how much were you planning to spend apiece on this?

MR. SCHAUB:  I don't know, but we started with an hour and then we shaved off an hour on our side to answer questions the Court may have or focusing on areas that the Court would like to focus upon.

So I think we really -- and I want to ask Ms. Merrill. Perhaps she could tell you the amount of time the actual slide presentation will take.

MS. MERRILL:  We have our slide presentation tailored, so it's depending on what plaintiff states.  I mean we're not going to cover some of the same areas, but, I mean, if I were to go straight through, I could do it within, like, 30 or 40 minutes easily.

THE COURT:  I would like to be done before 4:00 o'clock, if it's possible.

MR. SCHAUB:  All right.  Thank you.  That is very helpful.

THE COURT:  If it ends up being that much more complicated and subtle and I need assistance, we may need to go

over, but I would like to try to aim to do this, be done before 4:00 o'clock.

MR. CLARK:  Our hope is to complete our presentation in 15 to 20 minutes, your Honor.

THE COURT:  That sounds good to me.  So why don't you start?

(Whereupon presentation by Dr. Glew took place, previously transcribed and not included in this transcript.)

*        *        *        *        *

MS. MERRILL:  If your Honor doesn't mind, I would prefer to stay here.  Otherwise, I can come up to the podium. Let me see how this is going to work.  And I may move up to the front as well, so let's see.

Now, just as a preface so your Honor understands the purpose of why we may be going over some of the same material, is we respectfully disagree that shrink-fit is what is typically been used in the industry for processing semiconductor devices.  Xycarb's electrode is really the first one that's ever come out with a shrink-fit type technology.  So this isn't typical by any means.

Further, Dr. Glew is incorrect in that the differential coefficient of thermal expansion has anything to do with shrink-fit.  In our slides we'll be able to explain that a little bitter.

He's confusing similar sounding terms that are very different concepts.  He's confusing the differential of coefficient of thermal expansion with differences in temperature expansion.

And as we go through the slides, I think that will become a little more clear as well.

THE COURT:  Okay.

(Document displayed)

MS. MERRILL:  So we've divided the slide show into four parts and the first part, just to give a better background of the process, the process of producing semiconductor devices.  And what we want to do first is describe just basic principles of producing semiconductor devices.

So basically semiconductor devices are called integrated circuits or chips.  ICs is another short term used for it.  They are used in all sorts of electrical devices.  And this is a silicon wafer.  And you can see that the chip is -- the wafer has been processed and then the pieces are going to be put into the encapsulated -- the encapsulated chip -- into the plastic encapsulate, and that's what we see here.  I will show it better in the next one.  Let's see.

(Document displayed.)

So you have a process of a flat disk.  And we have one if you want to see one, if that will be helpful?

THE COURT:  No.  Why don't you continue with this?

**MS. MERRILL:** Okay. Got it.

So semiconductor fabrication starts with a silicon wafer, and it's made of 100 percent pure semiconductor grade silicon material. Then these wafers are processed through a series of steps, repeated many times over, in order to build up the chip structures.

And you end up with many chip's cores being created, and then a dicing saw that cuts those chips into pieces and then the result is this. The pieces are then put into this packaged chip and that's what ends up getting put into the electronic drives. Just to give a little more of an overview.

That's not going forward.

(Document displayed)

So just to understand a little bit of the process, the first -- there are different process steps as part of semiconductor chip fabrication. And what -- the essence of it is going to be depositing layers on the wafer with different electrical properties. And so you have insulating layers, semiconducting layers and conducting layers.

And the first step of it is a deposition layer is placed, and you can see where my -- the cursor is, the arrow.

This is on automatic, unfortunately.

The deposition on silicon wafer is deposited. And there is a -- a photoresist coating is placed over that. And then a mask is placed. And then the area exposed to light, reacts.

And that area can be removed, in this next slide here, like in that.  And then you have this area of plasma etching that takes place.  And then the photoresist layer is stripped.  And then the process is repeated.  And with that you get the build-up of the structures on the chip.

And what we're going to be done here is focusing on this one specific area, the plasma etching.

And plasma etching is also known as dry etching and it performs etching on the silicon wafer using a gas mixture in a plasma environment.  And when you have mixtures charged with the -- the plasma is a mixture of charged and uncharged gas particles, and their ions and radicals.  And that mixture reacts and removes the ions and molecules from the surface of the silicon wafer, which form volatiles, which are then carried out of the reactor chamber.  That allows for very small and precise structures that you see here.

You see right here the top layer is the photoresist layer.  Then you have a deposition layer.  Then what you end up with through the etching process.

THE COURT:  You have etched out that little valley of the plasma.

MS. MERRILL:  Correct.  And if you go and you see here, then you redeposit it so you can make other valleys and however is designed and however the chip -- you want the chip to look like.

Debra L. Pas, CSR, CRR, RMR, RPR
Official Reporter - U.S. District Court - San Francisco, California
(415) 431-1477

**THE COURT:** Deposit, you mean additional layers on top of the one that's already there?

**MS. MERRILL:** Correct. So you might end up with -- once this photoresist layer is removed, you might end up with another layer on top of it and just however the structure needs to be based on the design that's expected.

Basically we're focusing here on the plasma etchers. And these are the plasma etcher manufacturers, and we have them here in order by overall tool sales. And Applied Materials is the actual leader in selling plasma devices -- etching devices.

And then here is an example of an etch tool. And it has multiple etch chambers. And then there is a cluster set up and it's equipped with an automatic wafer handling system.

And this provides an inside view of the chip etch chamber. This particular chamber is a Tokyo Electron parallel plasma etch tool.

And then here is an example of the lower electrode. And this is specifically the lower electrode.

And here is the example of the upper electrode, which, as Dr. Glew mentioned, is also referred to as a shower head and it's filled with holes.

The upper electrode has an electrical function that acts to distribute the process gas as well. And it has many holes, which is why it's often called a shower head, and it's very common in a parallel plate plasma reactors.

So here is a cross section of a reactor.  And this is the upper electrode here in green.  And the -- and the upper electrode is -- has an electrode disk, and then it has a support ring that allows you to attach the electrode to the -- to the etch chamber, to the tool.

And then we have an electrode -- a lower electrode here, and that's where the silicon wafer is going to be placed.  And then the whole process is powered by DC and a DC -- an RF and DC bias source.

THE COURT:  It's applied to the lower plate?

MS. MERRILL:  Well, it comes in -- you have a ground coming out at the top, and you have a ground at the bottom. And this is probably a point that Dr. Lin could explain a little better.

Would you like to answer that question?  How the DC power --

DR.LIN:  So basically you apply a high DC voltage and on top the DC you add an AC.  An AC is to generate plasma and DC is actually to attract than the ion know that's charged, to bombard the surface, almost like bombard, such that you can have an etching.

THE COURT:  The AC is applied to the upper electrode?

DR.LIN:  I think the AC is applied on the bottom in this particular figure.

THE COURT:  AC with a DC bias on the lower electrode?

**DR.LIN:**  Yes.

**THE COURT:**  And the upper one is just a ground?

**DR.LIN:**  Yes.

**MS. MERRILL:**  Okay.  And that's what assists to pull the plasma through the shower head electrode, the charge, so that it pull it down with some force.

(Document displayed)

So here is where the silicon wafer is put into the -- on top of the lower electrode.  And then -- okay.

And then you have this rejection of the process gasses that take place.  And it's a uniform plasma.  And this is the adding of the reactive gasses.  And this enables -- this begins the etch process itself.  And the surface is covered with photoresist, do not reacts, which enables a selective etching of the silicon wafer.

**THE COURT:**  So that only that portion of the wafer that doesn't have the photoresist is subject to the etching by the plasma?

**MS. MERRILL:**  That's correct.

(Document displayed.)

Here is the upper electrode.  We're going to focus, going forward, the presentation on the upper electrode because that's what is at issue here in this case.

Here is the Lam upper electrode.  We've drawn this design based on the patent's Fig. 2A.  You can see.

And here is a picture of the electrode from the side that's not cross sectional.

And the Lam upper electrode is -- simply consists of a support ring.

First, you have an electrode disk.  It's highlighted.  And it's a silicon electrode disk in the shape -- electrode plate in the shape of a disk with a hole pattern to allow for the proper gas distribution.

And then you have the support ring, which includes a flange at the top that facilitates the attachment of the upper electrode assembly in the etch tool and a downward extension in the shape of an annular ring.

And the downward extension is sized to engage -- right here you can see, to engage the electrode plate about the periphery of the plate.

And the support ring is bonded about the periphery of one face of the surface of the electrode disk.

            **MR. CLARK:**  May I interrupt?

Your Honor, I understand that this is a tutorial about certain techniques.  It's not an analysis of Lam's product, which is not the criterion by which the patent infringed or the *Markman* rulings are to be determined.

We seem to be getting deep into infringement, let alone even *Markman* stuff.

            **MS. MERRILL:**  I don't --

**THE COURT:** Well, I'm going to allow this, assuming it is a foundational to some further explanation; but if it continues down this path, I'm going to say: Let's defer this to the *Markman* hearing.

**MR. CLARK:** Certainly.

**MS. MERRILL:** Thank you, your Honor.

Here we can just go through the slide. Here is the annular width, the perimeter of the disk here. Here is the edge of the disk and side of the disk. So as we go forward, when we're talking about the side, we're talking about this (indicating). When we're talking about the face, we're talking about this portion (indicating).

And here is the bonding material that's on the -- that's discussed in the specifications of the '266 reissue patent.

And the specifications -- and that is an important point going forward for the distinction that we're going to be making between this assembly and shrink-fit, so that you can -- so your Honor can understand shrink-fit. This assembly is placed -- and you can see the temperature gauge here. The whole assembly is heated. That would be the support ring and the electrode disk together. And that is done so that you can cure the bonding layer.

And then so you can also, as the -- you have a decrease in the temperature to room temperature, you start having -- because of the difference in coefficient of thermal expansion

you have radially inward stresses on the top face of the electrode disk by the support ring as a result of the bonding layer.

Okay.  So --

**THE COURT:**  In other words, it is bonded in a heated condition to cure the bond?  Like, the adhesive or whatever it is?

**MS. MERRILL:**  Correct.  The adhesive, solder or the brazen.

**THE COURT:**  Okay.  And then when it cools, are you saying because there is a differential in the CTE, that the -- there is some pressure because you've got -- you've got pressure on the bonding because it now wants to shrink more than the support ring?

**MS. MERRILL:**  That's exactly right, your Honor.  And we have some more slides that show it without the electrode ring, with just the material, so you can understand it a little better.

So the coefficient of thermal expansion is a physical property of matter that defines the change in dimension in response to a change in temperature.  Okay?  The coefficient of thermal -- oh, wait.

(Document displayed)

The coefficient of thermal expansion, we have abbreviated as CTE, and that was consistent with what all the experts have

been doing in their declarations.  It describes how the size of an object changes with a change in temperature.

Specifically, it defines a fractional change in size per unit of change in temperature.  Okay?  It's material property and different materials generally possess different coefficients of thermal expansion.

**THE COURT:**  All right.  You don't disagree -- that's what I've heard earlier, so there is no disagreement on that.

**MS. MERRILL:**  Right.  So the definition on CTE is the same.

**THE COURT:**  Yep.

**MS. MERRILL:**  There we go.

(Document displayed)

All right.  So here we have, just to understand what happens as you heat up, okay, two materials.  What we have here is -- it will demonstrate the effect of thermal expansion of different materials under temperature variations and the stresses that result from the process of bonding together two materials with a different thermal expansion when exposed to a temperature transition.

So this first example is a fully unrestrained situation where there's two materials that are not bonded.  And we're going to have two more examples that we can quickly go through that shows the process of the metallurgical bond and an adhesive bond.

(Brief pause.)

(Document displayed)

Okay.  This bottom axis indicates time, and we've highlighted it here in red.  And bars A and B are two different materials and they are sample materials.  The colors correspond with these temperatures.  So they are blue now because we're at room temperature and as they rise, they will turn red.

And the -- and then the materials are heated and cooled at the same rate, all right?  So here we have the temperature on the left axis and then we have a blue horizontal line that shows room temperature.  And then the bottom line shows -- the green line shows stresses over time, and then on the right axis here is the stress levels as they increase.

So here we have -- moving forward in time, we have the two materials starting at room temperature.  And now they increase.  And you can see that B has -- right here, has a higher coefficient of thermal expansion than A, material A.  So you can see as it heats, it expands at a faster rate.  And then that continues to -- as it heats.

And then as it begins to cool, the rate decreases.  And what is noticeable here is that the stresses are zero through this whole process because there is no bond between the two.  There is no restraint.  B and A are not acting upon one another because they are not connected.  They expand.  They contract.  And then the process ends with no stresses on the assembly

or -- and on the two materials.

And the next example we have a solder paste that's placed -- everything else stays the same.  It has the same materials and same coefficient of thermal expansion where A has a lower -- different -- a lower coefficient of thermal expansion than B.  Solder paste is placed in there.  This can be done with brazen as well.  The difference between solder and brazen is just the temperature in which the materials melt.

And so then we have an increase.  And then at the solder liquidus point, the solder paste melts and -- the solder paste is called flux.  I didn't mention that before.  Once it melts, it acts like a capillary action between the materials and spreads out.

And we still have no stresses because we have a liquidus solder that hasn't hardened yet.  And the materials expanded the same way as they did before.

And as the temperature goes down, once the solder solidus point is reached, the solder hardens.  At that point you start seeing stresses.  You see this radially inward stress because the material B is -- as it contracts at a faster rate, is pulling on material A and then you get the forces.  And because it's bonded, you have these forces and the forces then, if they reach a high enough rate, will begin to warp the assembly.

And so you see here the stresses.  You see the temperatures.  And it could warp it to the point where you

actually have tensiles.  So these are shear compressive stresses on the face of the -- of A, and on the bonding layer. And then if you have enough stress, you'll actually start getting tensile stresses in the opposite direction.  Okay?

And the same thing happens in an assembly where you have an adhesive, such as an epoxy resin.  And the epoxy resin needs to be at a certain temperature to be cured.  So the two materials are on top of one another.  You have a curing of the epoxy take place at this temperature.  And then once the curing temperature comes down below the curing point, which is this line here (indicating), you start getting inward radial stresses.  And, also, with enough stress you have -- you can have a warping that's as a result of B contracting at a faster rate than A because it had a higher coefficient of thermal expansion.  And then the stresses in this green line, you see they increase.

And, once again, you get enough warping, you're going to start having -- you're going to tensile -- well, you have -- you're going to have the tensile stresses, but they are going to become significant as you have more warping on the outer surface of A.  And you have radially inward compressive forces on the bonding layer and along the face of A because of B.

So all of this, as we've just explained, is the phenomena of residual -- thermal residual stress.  It's also called residual thermal stress, but it's all the same.  This is

textbook language:

"The phenomenon of stress is presented in the previous examples is well known...

"Residual stresses result from a mismatch in the coefficient of thermal expansion."

Then there is a comment about "the elastic modulus of the base materials," but that's basically how much the materials give, you know.

And then upon cooling from a relatively high joining temperatures, the characteristics of usual joining processes, the interface restricts the contraction of the material, concentrating local stresses.

So essentially the residual stress and -- let's see.

(Brief pause.)

Okay.  So the focus here is the residual stress is a result of the mismatch in the coefficient of thermal expansion.

So here we're talking about a differential in coefficient of thermal expansion.  Okay?  On cooling, after being joined at a high temperature, you have two of the units heating up together, you have a concentration of local stresses that result.

Here, again, we have the upper electrode assembly heated at a high temperature, the bonding material.  Then as it decreases with a metallurgical bonding or soldering or brazing or adhesive bond created, you get radially inward stresses

because of the differential in coefficients of the two materials and the fact that they were bonded together at a high temperature.  And so at room temperature, this is the stresses that result.

So, just quickly.  Some of the issues with the Lam electrode and -- is that you have cracking of the electrode plate, okay?  And that -- these are some of the reported issues in the industry and, also, in the specifications of the Lam patent, the '456 and '266 reissue patent.

And so due to the different thermal coefficients of expansion of --

**MR. CLARK:**  Your Honor?  I'm sorry to interrupt, your Honor.  The --

**THE COURT:**  Now we are getting into argument.

**MR. CLARK:**  The quality of Lam's product is so far removed from the claims.

**THE COURT:**  We are.  This is not a tutorial at this point.  So let's skip this.

**MS. MERRILL:**  Okay.  Well, just one point I wanted to make is you do have cracking of the electrode and that's because of these -- previously we had these -- when you get enough warping right here, and you have tensile forces here at the blue line, that can cause cracking.  And, also, you can have the bonding layer --

**THE COURT:**  I understand that.

**MS. MERRILL:**  Okay.

All right.  So now we're going to talk about something that's very different, that has nothing to do with residual thermal stress, and that's mechanical clamping through shrink-fit, okay?

Shrink-fit is an assembly technique where the components are joined that would otherwise interfere with one another.  And Dr. Glew went into this a little bit as well.

So the interference-fit is one of the classes of standard mechanical fits and it's defined by -- that define how elements mate to one another.

To achieve a shrink-fit assembly, you have a change in temperature in order to transition the assembly from -- between the different classes of mechanical fittings, but it's only on one component.  It's not a heating of both components.

So here we have an interference-fit.  Interference is the machined area where the components to be joined overlap.  So here it's like trying to fit a round square into -- a square peg into a round hole.  And so you have a transition of one of the components based on -- with temperature.  Here is the transition to create clearance-fit.  The two aren't going to fit together.

So an interference-fit, once assembled, falls into a class of friction-fits that's known in the engineering world.  Friction-fits rely on their structural integrity on the

principle of mechanical friction and clamping force.

So one method of interference-fit can be assembled is a shrink-fit, which we have been talking about.  And the temperature differential required to obtain a clearance-fit during the shrink-fit process can be achieved by either heating up one element or cooling down the other element.

So here we have an assembly by cooling, which I will just quickly go through because I think your Honor demonstrated that you understand this fairly well.  So, but we have a designed interference-fit and then one component here is cryogenically cooled, which causes thermal contraction of that component.

And then this will transform the interference-fit into the clearance-fit, allowing the mating of the two elements.

And then they are mated together.

And then once mated, as the inner component returns to room temperature, it expands to create a friction-fit with the outer component, which clamps the parts together.  And this method of shrink-fitting is also referred to as expansion-fitting or freeze-fitting.

If your Honor is interested, we have just a short video to show you on that works in real life.

THE COURT:  No.  I get it.

MS. MERRILL:  Okay.  So an assembly by heating is the same thing that occurs.  You start with room temperature.  And you see here, one component is heated.  The other one stays at

room temperature in order to achieve a clearance-fit.

This red material expands.  And then we have a clearance-fit.  And then the two were mated together.  And then as the temperature cools, you have the parts that fit together and are clamped.

And, again, I had a video, but we'll skip that.

So the shrink-fit principles and the relevant parameters here, and you'll see these are very different than thermal expansion.  And we'll have a comparison where you can see them side-to-side in a moment.

But the clamping force and designed stresses of the shrink-fit generally at room temperature are determined by the interference-fit and the material parameters.  Again, how much give that the material has, but it has nothing to do with CTE. The CTE --

(Interruption in the proceedings.)

MS. MERRILL:  What's that?  Are we okay there?  All right.

All right.  Although the change in temperature of one of the components is used to achieve a clearance-fit, the coefficient of thermal expansion is only relevant so that you can calculate what temperature you need to get to in order to heat the -- or cool that one component to achieve a clearance-fit.

THE COURT:  But if you have differential CTEs and you

heat both components, you're going to get a differential, either expansion or shrinking.  At some point that differential may -- that delta may be enough so that the interference disappears.

MS. MERRILL:  We're dealing with -- the coefficient of thermal expansion, if I may address that, your Honor, it changes over time.  It's not linear.  So every point that there is a temperature change, the coefficient is different as well for each material.

So to try and heat both elements or cool -- I mean, I guess theoretically you could do it, but you could theoretically try and accelerate and brake your car at the same time.  I mean, it just -- it doesn't make any sense.  It would be very difficult and, perhaps, Dr. Lin can explain a little bit better.

DR.LIN:  So if I would explain that you have a hole.  You have a shaft, right?  If you want to do shrink-fit, so you heat up the hole, right?  If you heat up both, remember, your shaft is also expanding.  So theoretically --

THE COURT:  Unless it has a very low CTE.  Then it won't expand as much.  Maybe it expands it 10 percent of the rate of the hole so that as you raise the temperature, the hole gains diameter at the shaft.

DR.LIN:  Exactly.  I think you got it, your Honor.  But in reality, you don't even need to heat up the shaft

because that's more efficient.

THE COURT:  I understand.  I understand.

DR.LIN:  Okay.

THE COURT:  I'm just saying, for whatever reason, you could do it either way.  Maybe it's not as efficient.  Maybe it uses more energy.  Maybe it's -- I don't know, but you could.  That's where the CTE, differential CTE, at least theoretically, comes into play.  It gives you that option.

MS. MERRILL:  Well, no -- well, the thing with shrink-fit is that you don't have to have a different CTE.

THE COURT:  You don't have to.  You could do it the other way, too.  You could heat just one component or cool one component.

MS. MERRILL:  That's where I think Dr. Glew has made this extra confusing, because you have a differential of CTEs.  You have two materials and the differential CTE is the difference between one material and the other.  That has nothing to do whether it shrink-fits or not.

The shrink-fit is the interference.  The forces that are involved are strictly the interference.  The CTE -- and we'll show this in just a moment because we show the calculations for the forces of each.  I think it will be better explained.

So here you have -- this is from Dr. Lin's declaration and it explains if you have a -- right here you have a bonding layer putting a ring on top of electrode.  This right here

(indicating) is the coefficient of thermal expansion, okay? You have a high temperature bonding.  Then as you have the shrinkage, the cooling to room temperature, you have a support ring exerting shear stresses on the top of the electrode.

So here you can see are the two coefficients of thermal expansion.  And you use that to determine the stress in this assembly.  Okay?

If you look at the shrink-fit -- and here we've just created a hypothetical shrink-fit.  And you have a support ring, because you have to have a male and female component. You can't do this on a flat surface with shrink-fit, okay?

So you have a high temperature.  Here is the coefficient of thermal expansion again.  This same symbols.  You have the shrink-fit that occurs with a high temperature of just the ring.  And then you have them come together and you end up with normal stresses acting on the side of the disk, rather than on the surface of the disk at room temperature.

And then you see here these links.  The diameter of the electrode is B, and the diameter of the support ring is C.  And then if you look at the equation on how you calculate the stresses involved with shrink-fit, it has nothing to do with CTE.  It has nothing to do with a different, right here, of the thermal coefficient of thermal expansion.

The calculation is based solely on the dimensions of A and B and the difference in those dimensions.  It's based solely on

interference.

So while heating is used in order to achieve shrink-fit, the stresses and the -- it has nothing to do with what shrink-fit is.

So here if you look at the comparison between the two -- let's see one moment.

THE COURT: Well, I could see where the coefficient of thermal expansion might be relevant here. The amount of friction that -- if you have something that expands very elastically with a very high CTE and you only heat it to a certain temperature, it's going to expand a lot more and then you can get a lot more play in it. And when it shrinks, it shrinks more and, therefore, increases the friction fit.

DR.LIN: Can you repeat? Sorry.

THE COURT: I could see where the CTE might be relevant in determining the stress forces, the amount of friction, because if the ring on the outside expanded greatly in response to temperature, therefore, it shrinks greatly when it goes back down to room temperature, that would suggest that it has all that much more pressure than something with a very low CTE that only expands just slightly. It does haven't much -- it's like a rubber band. You know, it's a weaker rubber band or a stronger rubber band.

DR.LIN: The calculation, theoretical calculation, you could see the formula has nothing to do with the CTEs of

the individual component.

The example, your Honor, you're talking about is kind of a common sense, but what you're describing is something that has, I guess, what we call maybe plastic information?  That's adding into typical -- when we try to make the structure or probably stay in the elastic region, which means linear.  So we actually probably not prefer those kind of formation, the plastic formation happening.

I think that's pretty much everything happening.  Don't use that particular region.  That is why the formula that I actually found from the textbook, actually from the declaration of Dr. Glew, does not include the phenomena you're talking about.

**THE COURT:**  Well, put it this way.  The inner radius, which is B in that lower thing, of the supporting ring could, in its natural state, it's room temperature state, be smaller.

I mean, it could be shorter -- the more shorter it is, the more pressure it is, the more friction it exerts, more compression it exerts on the electrode, right?  And so if -- if that radius B is small, if you have a high CTE, you can afford to start with a very small B because it's going to expand a lot more in order to make that fit before you cool it back down again.  That's all I'm saying.

**MS. MERRILL:**  Your Honor, can I respond to that?

Your Honor, in that example A and B, when you get down to

room temperature, would fall apart.  So you would have no shrink-fit.

THE COURT:  Say that again.

MS. MERRILL:  If you have A, the electrode that's a little bit -- a little bit wider than B, the disk, okay?  So here (indicating).

So if there is space between the two, rather than there being an interference-fit, okay?  So there is no interference. There is a space.  Then you heat it up --

THE COURT:  No, no, no.  That's not what I'm talking about.  You're going to have an even bigger interference problem that you can then accommodate through this shrink-fit technique.

The outer ring has a high CTE because it's going to take a very small opening and expand greatly when you heat it up and then it's going to go back down.  So it has -- at the end maybe it's the same, but all I'm saying is that CTE could be relevant to determining the amount of -- the compression and friction.

DR.LIN:  I think what your Honor is describing is the process, which means when you try to make the shrink-fit, the CTE does matter because determining how much you expand or shrink.

THE COURT:  Yeah, yeah, yeah.

DR.LIN:  But at the end, the stress has nothing to do with those parameters.

THE COURT:  All right.  Depends on how much interference there is in the first place.

DR.LIN:  Right.

MS. MERRILL:  So basically, I think, when -- I think what's helpful is when one looks at it, you have to think:  Are you talking about at room temperature, or at operating temperature or at what temperature?  So all of this, when we're talking with what the CTE is, is based on room temperature, and are you going to end up in an assembly that sticks together other not.  So, and all of that in shrink-fit is going to be based on the -- on the interference and not on the CTE.

Now, that's not to say what your Honor is suggesting that at operating temperature, you will have stronger and greater forces if you have a differential in coefficient.  So you can still have this side surface forces being exerted on the side, but as you increase, if you have two materials that have different coefficients of thermal expansion in a shrink-fit assembly you will have those forces increase as you -- as the temperature increases.

THE COURT:  You could either increase or decrease depending on which way the differential is?

MS. MERRILL:  Exactly.  So in the example we have here.

THE COURT:  Yes.

MS. MERRILL:  So, okay.

So let me see where...  So just to fit side-by-side.  You have the shrink-fit -- the shrink-fit assembly method is based on an interference-fit, which allows for force-free mating. And then you have the heat, just a temporary -- used temporarily to transition into a clearance-fit.  And then you just heat up, typically in the industry, one component or two.

So in the residual stress you have different CTEs and observed -- observed at the temperature different than the joining temperature.

Again, the operating temperature -- not the operating temperature, because the bond happening happens, but over operating temperature.  When the bond occurs, there are no stresses and then at room temperature, you get the stresses.

**THE COURT:**  Right.

**MS. MERRILL:**  So the difference in the magnitude or the ratio of CTE and the components in shrink-fit is -- at room temperature is irrelevant.  And it's irrelevant to have a -- have this as designed.

And the difference in the components in CTE and under the theory of residual thermal stress is that the foundation and the cause of the residual stress, which is also known as pre-stress.

The temperature is utilized in only one component in shrink-fit, and so that the two components can be joined.  And in the residual thermal stress you have to have the bonding at

a higher temperature, so you can cure it.  So it has to be both heated in order to achieve that bond.

And then shrink-fit utilizes a mechanical structure for clamping a female component and a male component to create normal stresses on a coating side of a disk that can't be achieved on only the top flat surface of the disk.  You have to have those side surfaces.

And then -- but on a residual thermal stress model you have a -- you can do that on one flat surface of the disk and that creates a shear stress on the surface, rather than a direct stress.

If we look at just a summary of the some of the text that's out there, this is a patent on bonding ceramic materials.  It sets forth a difference between the mechanical bonding method, such as screwing, shrink-fitting or so-called fitting, and it distinguishes that from an adhesive method or solder method or a solid phase diffusion method.

Then this text here, this is a chart from recent advances in metal ceramic brazing.  Again, you see the mechanical joining that puts clamping, fitting and screwing in one category, which includes shrink-fit; and an indirect joining is adhesive and solder brazing.

And I don't know if this is helpful, but we just thought we would put this in.  So here we have a shrink-fit detail with a -- on the side surface and in here is what you have in the

Lam electrode --

THE COURT:  Go back to that an second.  What is what there?  Which is the electrode?

MS. MERRILL:  We have some electrodes, if your Honor would like to see it.  Would that be helpful?

THE COURT:  Yeah.

MS. MERRILL:  Okay.

(Brief pause.)

MS. MERRILL:  May I approach?

(Electrode was tendered to the Court.)

THE COURT:   So it's the groove --

MS. MERRILL:  And here, Mr. Clark, these are just the two assemblies.

(Electrode was shown to counsel.)

MR. CLARK:  I don't know why we're looking at Lam's product, your Honor.  It's not described in the -- we're not talking about infringement of Lam's product.

THE COURT:  But if this is an illustration of one technique, it's helpful to me to actually see it, rather than just a drawing.

MS. MERRILL:  This is a cut-in-half Lam electrode. And the Xycarb actually comes apart and has cracked as a result and fell on the floor, but you can see how it works.

(Whereupon, electrode was tendered to the Court.)

THE COURT:  So the bonding is achieved by -- through

these grooves?  Pressure in the he was grooves.

MS. MERRILL:  There is an interference between the electrode plate and the ring.  And then as the ring is heated, it's --

THE COURT:  The point of contact is in the groove.

MS. MERRILL:  Yes.  Along the side.

THE COURT:  That's where the friction is.

MS. MERRILL:  Exactly.

THE COURT:  And this is adhered to, this other one, the Lam?

MS. MERRILL:  Yes.  And that's on the flat surface of the disk.

(Brief pause.)

MS. MERRILL:  The three-quarter one is a Xycarb.

THE COURT:  Pardon?

MS. MERRILL:  The three-quarter one is a Xycarb.

THE COURT:  Yes.  And they both have the groove feature.

All right.  Thank you.  You can take these back.

(Electrodes returned to counsel.)

THE COURT:  All right.

MS. MERRILL:  All right?

THE COURT:  Okay.

MS. MERRILL:  Any questions?

THE COURT:  No.  I think I -- you know, now that

I -- it actually helps to visualize this, so it's helpful.

MS. MERRILL:  Yeah, we agreed.  So we thought we would bring it.

THE COURT:  Yeah.  All right.

MR. SCHAUB:  Yes.  Thank you very much, your Honor.

THE COURT:  All right.  Thank you.  So this has been instructive.

MR. CLARK:  Your Honor, can I just comment briefly?

THE COURT:  Yes.

MR. CLARK:  A couple things.

I think we got far too deep into the *Markman* today and probably even into the infringement, but what their presentation was based on was one embodiment.  You'll notice that it didn't include the Fig. 1 that was part of Dr. Glew's presentation.  So there is no contradiction of his analysis of that embodiment.  As far as -- so a lot of what you heard was irrelevant.

And with the greatest respect to my learned colleague, and she's not an engineer, I'm not suggesting I would have done a better presentation, but I think that there were flaws in the analysis and we'll deal with that at the *Markman* hearing.

One final comment on that last product that was given to you.  That -- the Xycarb product is Example 3 of our presentation.  So the ring expands and as the ring expands, it expands broadly enough to actually fit into the grooves.

THE COURT:  And then it contracts.

MR. CLARK:  So you get your stresses on the inner -- on the inner circle of the bottom and on the -- I guess, the inner circle of the ring as well.

That's all I had to add, your Honor.

MS. MERRILL:  If I might just respond to the one comment of Mr. Clark?

As far as the relevance and how -- his statement that Lam -- that what we've explained is just one embodiment, I would like your Honor to keep in mind, if you would, that Claims 32 and 33, which is, I think, the embodiment that is being referenced by Mr. Clark, is the base of the argument that plaintiff is making that their invention encompasses shrink-fit.

THE COURT:  We'll get into that at the claim construction, or the motion for reconsideration.

So, all right.  Thank you.

MR. CLARK:  Your Honor, may we deal with some housekeeping matters?

THE COURT:  Yes.

MR. CLARK:  First, with regard to the *Markman* hearing, your Honor, we intend to put on one witness.  And I was curious to know whether you're going to limit the time.

We have very limited time.  We have three motions to decide or to argue, as well as the *Markman* hearing.  What I

suggest, your Honor, is that you respectfully -- that you divide the time up between the two of us and allocate whatever amount of time you think appropriate.

THE COURT:  What do you mean between the two of you?

MR. CLARK:  Well, between the two sides, your Honor, so that there is a fair distribution.  I think they two expert witnesses and it seems to me that they should put their two expert witnesses on in the same time --

THE COURT:  I guess the question is:  Why do we need expert witnesses?

MR. CLARK:  Your Honor, the reason we want to offer Dr. Glew is because we want to show what a person skilled in the art would understand from reading the patent.

THE COURT:  And submission of a declaration is not sufficient?

MR. CLARK:  We have submitted the declaration, your Honor.

THE COURT:  Pardon?

MR. CLARK:  There is a declaration.

THE COURT:  So what is to be gained from live witnesses?

MR. CLARK:  I just -- just the fact that I think live testimony is more informative than the dry word on a page. And -- I mean, we're willing to accept time limits, your Honor, of a half an hour or, you know, whatever you think appropriate

and we are prepared to allow the witness to be cross examined, of course, if he testifies.

That's why I bring up the issue of time limits, your Honor, so we have some kind of outer parameters of the hearing and everybody gets a fair shot.

THE COURT:  Well, let me ask:  Why do you feel -- you're intending to present two witnesses?

MR. SCHAUB:  No, no.  I agree with the Court.  I do not think that we need an expert witness with regard to the claim construction hearing.  We have had quite a bit of technology here today.  I think both sides have left their information for your Honor to review.

And I think that the claim construction should focus upon, principally, the legal issues and how they relate to the primarily intrinsic evidence and some extrinsic.  But I don't think that includes the -- nor do I believe that it would be hen full to have experts because the claim construction is a horse of a different color.

I really think that -- we have a lot of issues that we've raised and we would like to focus on what's really key in the issues in the motions and in the claims construction briefs. And I think that the time is -- would be best served if we focused on those contentions that both parties have filed.

THE COURT:  Well, I'll tell you what.  I'm not going to make a decision right now.  I'm going to look at the papers,

but my -- my presumption is that I don't think I need to hear live witnesses.  I mean, this is not that complicated.  It's a large -- a lot of this is -- you know, obviously claim construction is a legal question.  The question about that -- that you presented on the motion for reconsideration is largely a legal question.

    And to the extent that there are issues about what an expert can provide, I don't -- that's provided for in the materials and in the declarations.  I don't know why I would need to hear live testimony.

        **MR. CLARK:**  Your Honor, here is why.  Dr. Glew has said that as a person skilled in the art, he read the patent and it taught him shrink-fitting.

    Dr. Lin has said:  I read the patent and as a person skilled in the art, the patent doesn't mention shrink-fitting.

    That's a very difficult factual gap to bridge on the declarations.

        **THE COURT:**  Well, but what's the testimony going to add?  Am I going to judge credibility by demeanor on the stand or isn't this more like surveying the field and assessing that ultimate question?

        **MR. CLARK:**  Your Honor, I'm going to argue to you that you, as a lay person, can read the patent and see that it claims shrink-fitting, just as in the patent -- in the claim construction order that was made initially.

However, I presume that defendants are going to rely on Dr. Lin to say:  Judge Breyer said that the patent described the very essence of a shrink-fit.  Dr. Lin disagrees.

How are you going to --

**THE COURT:**  No surprise that the experts disagree, but we don't have -- and this happens in every case, every patent case.  You're going to get expert declarations from each side.

But rarely, in my view, unless there's something specific that has to be elicited live, I'm not sure I understand why we would devote that kind of time.

**MR. CLARK:**  Your Honor, I guess -- if you think it would be helpful on this issue of whether the patent does -- does do what the claim construction said, that it's the epitome a shrink-fit, the essence of a shrink-fit, I mean, if you think the patent reads like that, then, of course, you won't need expert testimony.  And, of course, I wouldn't press you to change your mind at all on that.

**THE COURT:**  Let's do this.  Like I said, I'm not going to decide today.  I'm going to look at this more carefully and I'll let you know sufficiently in advance whether we're going to have -- whether I think it would be useful to hear testimony; and if so, I will set whatever time limits I think are appropriate at that point.  So I'll give you some advance notice.

But right now I start with the presumption, particularly in this case, I don't think I need it, but I'll look at it more carefully.

**MR. CLARK:**  Your Honor, one more point.  I'm sorry to detain you.  I know you've had a very long day.

Defendants agreed to provide the opinions of counsel and as recently as last Monday, I got an email from opposing counsel to say that they would be provided -- because we requested them and they agreed in 2011 to provide them.  As recently as last Monday, I got an email saying that they would be produced if I would agree that they would not constitute any further waiver beyond the actual production.  I agreed to that.

Friday afternoon I got an email saying they were going to approach you to bifurcate the case because they didn't want to produce these opinions and they want to bifurcate on the grounds of exemplary damages, of willfulness.

Your Honor, the opinions that we're asking for were referenced in the opposition to the TRO motions.  They were referenced by two witnesses.  They were relied on in the argument that they were -- against the TRO on the balance of the equities.  So these opinions are in this case already.

There has been a complete waiver and I believe -- or I suspect, shall I say -- that the opinions are going to be inconsistent with what's being offered to you in the *Markman* testimony.  And I believe there is a reasonable grounds that --

that -- for believing that they're relevant.  They have offered to produce them and now they've changed their minds, and I wrote ask you to direct them to produce those opinions before the *Markman* hearing.

MR. SCHAUB:  Your Honor, I would like to have Ms. Merrill address this issue.  She has been handling discovery issues and discovery matters in regard to document production.

MS. MERRILL:  Yeah, just to clarify a few points on the communications that took place.  So our -- where to begin? There was a lot that was covered by counsel, your Honor.

So, first of all, in the communications ahead of time we indicated to counsel we didn't think it was appropriate to bring this issue and basically attempt to make an oral motion before the Court and that there would need to be some briefing.

We disagree that there has been a waiver.  There hasn't been a defense actually asserted in the pleadings regarding willful infringement.

But what I did tell counsel -- and we had responded in document requests and we objected on the basis of attorney-client privilege and we did say we were going to produce these opinions, but then about I asked counsel for a limited waiver, he said:  Yes, but, you know, except to the extent that law doesn't consider it a limited waiver.  So with that, we revisited the issues since there wasn't an agreement,

a limited waiver just to those opinions.

In fact, I got an email from counsel that has basically cited a case and their position that says if we produce these opinions, we waive all work product, all opinions that deal with infringement from those counsel that were early on in the case, plus all the way through potentially to counsel presently not case. So, I mean, if we're going to have some kind of order to produce opinions, it real needs to be done in a briefed process in a motion.

Additionally, the opinion -- we don't believe the opinions are relevant, but there was a -- counsel mentioned in the email where I talked about bifurcation. And what happened is when counsel asked this about me, I found the case in the Federal Circuit that suggested that the way to handle this when you have the Court look at the potential of an opinion versus -- and in the production of opinion to deal with the issue of willful infringement versus the hardship of waiver that's set forth in some of the law, that one way to resolve that potentially is to have a decision on liability and then potentially after the fact deal with the issue of willful infringement and production only after the liability issue is resolved. But I haven't -- we haven't decided. This just came up yesterday and so we wanted to look into this issue more.

THE COURT: Let me ask: You read my standing order, correct?

**MR. CLARK:** I've read it, your Honor, yes.

**THE COURT:** All right. You know the procedure for raising a discovery issue?

**MR. CLARK:** Your Honor, this came up yesterday.

**THE COURT:** Then you know the procedure for --

**MR. CLARK:** Yes.

**THE COURT:** You know, if you want to deviate that, there are procedures to deviate that.

At this point you're asking me to rule on something that I've seen nothing about. I have no briefing whatsoever. And so I -- you know how to follow the rules. If you want to expedite things, you can move to expedite things.

**MR. CLARK:** Your Honor --

**THE COURT:** At this point I'm not prepared to issue any ruling at all.

**MR. CLARK:** I understand, your Honor. I expected that you wouldn't. But if I got a letter brief to you by noon tomorrow, would you set a --

**THE COURT:** It's not a letter brief. You should read the rules. It talks about a joint meet-and-confer and a joint letter setting forth your respective positions in a succinct and abbreviated fashion, so I have a sense of what the positions are, where the dispute is at this point, its context, and a brief statement of supporting authorities. And then you can -- and then I'll decide whether I want full briefing,

whether I'm going to resolve this on the papers, whether I have to have a hearing, whether I refer this to a magistrate judge, whatever.

         MR. CLARK:  Okay.

         THE COURT:  That's my promises.

         MR. CLARK:  Thank you.

         MS. MERRILL:  Thank you, your Honor.

         MR. SCHAUB:  Thank you very much for your time, your Honor.

             (Proceedings adjourned.)

*Debra L. Pas, CSR, CRR, RMR, RPR*
*Official Reporter - U.S. District Court - San Francisco, California*
*(415) 431-1477*

**CERTIFICATE OF OFFICIAL REPORTER**


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, March 26, 2014