Pages 1 - 93

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JOSEPH C. SPERO, MAGISTRATE JUDGE

```
LAM RESEARCH CORPORATION,     )
                              )
            Plaintiff,        )
                              )
     v.                       )   NO. C 03-1335 EMC (JCS)
                              )
SCHUNK SEMICONDUCTOR and       )
XYCARB CERAMICS, INC.,        )
                              )
            Defendants.       )
------------------------------)
and related cross-action.     )  San Francisco, California
_____)  Friday, August 15, 2014
```

**TRANSCRIPT OF OFFICIAL ELECTRONIC SOUND RECORDING
OF PROCEEDINGS**

FTR 9:40 a.m. - 2:14 p.m. =  113 minutes

**APPEARANCES**:

For Plaintiff:          Carr & Ferrell LLP
                        120 Constitution Drive
                        Menlo Park, California  94025
                   BY:  **STUART C. CLARK, ESQ.**

For Defendant Xycarb:   Wong, Cabello, Lutsch, Rutherford
                         and Brucculeri, L.L.P.
                        20333 SH 249, Ste. 600
                        Houston, Texas  77070
                   BY:  **J. DAVID CABELLO, ESQ.**

Transcribed by:          Leo T. Mankiewicz, Transcriber
                         leomank@gmail.com
                         (415) 722-7045

Friday, August 15, 2014

9:40 a.m.

P R O C E E D I N G S

**THE CLERK:**  Calling case number C03-1335, Lam Research versus Schunk Semiconductor.  Counsel, please state your appearances.

**MR. CLARK:**  Good morning, your Honor.  Stuart Clark appearing for Lam Research Corporation.

**THE COURT:**  Mr. Clark.

**MR. CABELLO:**  Good morning, your Honor.  David Cabello, C-A-B-E-L-L-O, appearing for Xycarb Ceramics, Incorporated.

**THE COURT:**  Okay.  So, welcome to new counsel.

**MR. CABELLO:**  Thank you, your Honor.

**THE COURT:**  New counsel, same old story. Unreasonable behavior by everyone.  I'm appalled at the history of the discovery fights in this case.  I think counsel has violated their obligations to the court and to their clients under the Federal Rules of Civil Procedure, by not being flexible and not seeing the forest for the trees.  This is just an appalling, an appalling, display.

So we're going to go through it.  I've cleared everything else off my calendar this morning.  We're going to go through it one by one, and I'm going to make rulings, and then there are some (indecipherable) and I'm going to send you

both to the jury room, where you will stay till you resolve them, and any other disputes you currently have, because people seem to be threatening to file other letters, but...

Let me ask one question.  What is the -- maybe it's per loss.  Maybe it's per Lam.  So these are -- it's a patent that's expired, right?

**MR. CLARK:**  Correct, your Honor.

**THE COURT:**  So what's the loss?  How much?

**MR. CLARK:**  We haven't put out reports yet, your Honor, but we guess ballpark, 10 to 15 million.

**THE COURT:**  Ten to fifteen million dollars, and you've got so far, like, six or eight discovery disputes, in a small patent case?  You people are out of control.  Out of control.  I don't know what -- I don't like sanctioning people. You know, I can count on, you know, certainly on both hands the number of people, the times I've sanctioned people in the last 15 years, but this case begs for it, because nobody is -- everybody has got their head buried in their own thinking about what they're entitled to, not what's important.

Discovery is about to close.  You should be figuring out what's important.  That's what you should be focusing on, and I don't think -- I'm not inclined today to sanction anyone based on the conduct so far, but -- and I may change my mind during the course of the morning, depending on how this goes, but I will tell you, if it continues, I will have to revisit

that thinking, because somehow, somewhat, some judge has got to get ahold of this, so that you will both be reasonable.

So docket number 354, the 30(b)(6) motions of Lam noticed by Xycarb.

Number 1, specifications and designs for all commercial products Lam manufactured.

Now, this is my tentative ruling on it. Lam is arguing that they lost profits and sales as a result of this entrant, and that therefore, evidence on the specifications and designs of the product, the sales of which were allegedly lost, are relevant to whether there would have been substitute sales or whether the products at issue would even qualify for lost sales protection.

So I would allow this deposition topic as to all Lam products that Lam contends it lost sales of, or lost profits regarding.

Anyone want to say anything on that?

MR. CLARK: Yes, please, your Honor.

THE COURT: Make it quick. I've read everything you've submitted.

MR. CLARK: Your Honor, the issue here, as is admitted in their response, is whether -- which product had elastomeric bonds, because they -- elastomeric adhesive to bond them together, because it's defendant's position that those are covered by a different patent that's not asserted in the claim

that's the '577 patent, or whether they were an indium -- indium-bonded, which is a solder, and which are clearly under the '456 patent.

Now, Lam believes that all products are under the '456 patent, but nevertheless defendant, in order to make that argument, needs to know which is the indium-bonded -- which is the indium bond and which is the elastomeric bond.

We have produced, in response to either an agreement or an order when we were here before you before, diagrams and specification for each of those -- each of the Lam products, which shows exactly which are the indium-bonded and which are the adhesive-bonded with elastomeric adhesive.

That is the only reason why any discovery is required for.  Here's --

THE COURT:  Why isn't it -- so you're not answering my suggestion.  Answer my suggestion, that it's relevant to lost sales and lost profits.  Why isn't the specifications relevant to causation in the lost sales?

MR. CLARK:  Your Honor, it's an incredibly simple product.  It has two components.

THE COURT:  Well, then, the specifications and designs will be incredibly simple.

MR. CLARK:  That part, but your Honor, this is the origin and development of the specifications, and how could this possibly be relevant?  I get an engineer, says, okay,

here's how -- the specification, we made this thing 8 inches wide because it was going to be put in an 8-inch machine.  We made this 6 inches wide.  This is why we decided to treat this feature of the product --

THE COURT:  But it all goes to -- I mean, I don't know the details of the causation argument, but why aren't these sorts of questions relevant to the question of whether or not the market would substitute your product with their product?

MR. CLARK:  Well, your Honor, it's relevant at a superficial level, not at this -- if.  Here is a data sheet that they've produced that shows the Lam product and their product, and we've got these for every single product.

So they know exactly what the comparative product is.  They don't need to know who designed it.  They don't need to know who created the specifications.  But --

THE COURT:  Okay.

MR. CLARK:  -- they do need to know --

THE COURT:  Fine.

MR. CLARK:  -- they do need to know whether or not it's elastomeric, and they do need to know what's in here, because of the argument that I just mentioned.  I accept that. Your Honor, we --

THE COURT:  Why didn't you produce that information? Did you already produce that information?

**MR. CLARK:**  Yeah, we've produced the --

**THE COURT:**  Okay.

**MR. CLARK:**  -- witnesses, the 30(b)(6) witnesses, your Honor.  We've produced the inventor yesterday.  We spent, the day before yesterday, we spent almost seven hours --

**THE COURT:**  So is this one moot?

**MR. CABELLO:**  No, your Honor, it's not.

**THE COURT:**  Why not?

**MR. CABELLO:**  As it turns out, I believe that Judge Chen's ruling is such that if anything applies to the patent or if the patent reads on anything, it's the indium-bonded electrodes.  At some point, because --

**THE COURT:**  Okay, well, but don't you know the details enough of these products to know which ones were solder and which ones weren't?

**MR. CABELLO:**  We know that, although there is a question about whether they've fully furnished all the documents, which we'll get to later, your Honor, but the question is, why did they move from indium to the elastomeric bonding?

First of all, we don't believe that the elastomeric-bonded electrodes fall within that, and I've learned a little bit about that during one of the inventors' depositions.  He said --

**THE COURT:**  Well, don't -- just get to the point.

You've got -- I'm not going to spend --

MR. CABELLO:  All right.

THE COURT:  -- half an hour on each of nearly 80 things you've got here.  You've got two minutes.  Make your point.

MR. CABELLO:  The point was that they moved to elastomeric-bonded because the power and rating of the power supply changed and the frequency changed.  What was it that caused that?  We believe it's got -- it was driven by commercial reasons, and we don't believe that the elastomeric-bonded electrode is a substitute for the indium.

And so what happened is they phased out that indium-bonded electrode, and that's the only one that we competed with, was the indium-bonded electrode.

THE COURT:  Okay, so I'm going to allow --

MR. CLARK:  Your Honor, may I just respond to that?

THE COURT:  I am going to allow...  Listen, you're being unreasonable.  You're being unreasonable.  This is one you can give on.

MR. CLARK:  The --

THE COURT:  This is one you can give on.

MR. CLARK:  I've got 25 years of design, your Honor, 25 years of design, your Honor, is what the witness has to cover.  It's enormously broad.  I mean, you know, your Honor, with great respect, yesterday we learned why the indium bond

was changed, because it has -- the machine's got higher pressure and a higher voltage and a higher temperature.  Indium melted and it caused contamination.  They had to change it for higher powered machines.  They still sell those indium bonds for old machines.

THE COURT:  Okay, so what more do you need to know?

MR. CLARK:  That's the point, your Honor.

THE COURT:  I'm asking him.

MR. CABELLO:  We need to know what it was that caused it, warping, all of that that got reports --

THE COURT:  Why do you need that?

MR. CABELLO:  Because we want to show that the elastomeric-bonded is -- is a replacement for the indium, and while we may compete with the indium, we don't compete with the elastomeric.  They are trying --

THE COURT:  Well, why -- how is this information -- we already know that it's a replacement.  You know why it was replaced.  What more information are you going to get about the history of the development of these products that's relevant to your subject?

MR. CABELLO:  We'd like to see the contemporaneous notes and the specifications as to why they were motivated to move -- yes, the inventor has said higher power, higher frequency --

THE COURT:  So this -- so you don't need everything

that's in your description, here, of the topic for the 30(b)(6).  You don't want the origin and development of all the specifications.  What you want is something quite narrow, like, you want to know about the change.

MR. CABELLO:  Yes, we do, your Honor.

THE COURT:  So why don't you say the change?

MR. CABELLO:  We -- we've found, your Honor, that if we don't ask for something broadly, then there is an evasive answer.

THE COURT:  No, that's crap.  That's a lawyer's -- that's just a defensive lawyer's action.  That, I've got to tell you, that is outrageous.  That's -- I can't stand lawyering that way.  You ask for the universe when you only want a tiny little thing.

You ask for what you want.  More importantly, you ask for what you need.  You go beyond that, you risk a judge saying it's way too broad.

MR. CABELLO:  Your Honor, if I may, I'm operating here at a tremendous handicap because I've entered the case recently.

THE COURT:  No --

MR. CABELLO:  I know that's not an excuse.

THE COURT:  It's not an excuse, and I will completely ignore it.

MR. CABELLO:  All right.

**THE COURT:**  You are responsible for everything that was done by your predecessor.

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  You have to live with it.

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  I'm not going to give you special dispensation in any regard because you're brand new.  None.  That's the client's decision.  You have to live with the client's decision.

So what you're saying is you need, with respect to the products, the -- Lam's commercial products, the sales of which Lam contends were lost or profits were lost, you need to know -- have a person to testify as to the reasons for why Lam created a product using -- what's the later bonding method?

**MR. CABELLO:**  Elastomeric.

**THE COURT:**  E -- las -- to -- mera?

**MR. CABELLO:**  -meric.

**THE COURT:**  E-L-A-S-T-A-M-E-R-I-C (sic)?

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  -- elastomeric bonding, after previously using -- and what's the other kind of bonding?

**MR. CABELLO:**  Indium bonding.

**THE COURT:**  How do you -- I-N...?

**MR. CABELLO:**  I-N-D-I-U-M.

**THE COURT:**  Indium bonding, okay.

Second, quality assurance, testing of the product for quality assurance, why do you need that?

MR. CABELLO:  Because again, Lam contends that that elastomeric-bonded electrode is a substitute for the indium-bonded, the patented indium-bonded, and so --

THE COURT:  So this will show what?

MR. CABELLO:  It shows whether or not it's a substitute.  Was it tested --

THE COURT:  Well, how does it say whether it's a substitute?

MR. CABELLO:  Well, was it tested to the same standards?  What kind of outgassing did they have?  What kind of contamination of the etcher chamber did they have?

THE COURT:  So you don't want the testing of every single -- of all of their -- of all their commercial products for the last 20 years, regardless.  What you want is, what?

MR. CABELLO:  We want a head-to-head comparison of indium, how they tested those and what the results of those were, versus --

THE COURT:  When did they come up with the elastomeric product?

MR. CABELLO:  I believe it was --

MR. CLARK:  Early 2000s, the early 2000s.

MR. CABELLO:  -- in the early 2000s.

THE COURT:  Early 2000s?

**MR. CABELLO:** Yes, your Honor.

**THE COURT:** Okay.

**MR. CLARK:** So most of these sales are elastomeric. There are very few indium sales.

**MR. CABELLO:** And that's the reason that they're trying to glob on to the elastomeric, is because there was very few indium.

**THE COURT:** I understand that, but I'm not sure I care about that.

Well, so is there a way to narrow what you want other than all testing for an indefinite period of time of all their products?

**MR. CABELLO:** Your Honor, they have a limited number of indium electrodes. If we can get the tests and the test reports and the quality reports for those, and they have a limited number of elastomeric electrodes --

**THE COURT:** So what are we talking about, in terms of quality assurance and the quality control tests that you've done, if I could ask Lam?

**MR. CLARK:** I assume that they must have done. I mean, they had -- it was a problem with the indium bond that caused the elastomeric bond to be created.

**THE COURT:** Okay.

**MR. CLARK:** So that's -- and we produced what we have, some testing results, I guess on the elastomeric, not on

the indium.

**THE COURT:**  Okay.

**MR. CLARK:**  Because this happened in 1988 --

**THE COURT:**  There must have been testing on the indium, that's part of the changeover.

**MR. CLARK:**  But your Honor, this product has been on the market for, you know, 10, 15 years now.  It's -- the quantity's listed on his spreadsheet.  You know, I'm just not sure -- let's say they go to trial and --

**THE COURT:**  So -- so let me just ask you this:  What are the products which you're -- are any of the products that you're contending -- claiming that you lost sales of, indium-bonded?

**MR. CLARK:**  Your Honor, we're looking at a sort of selection, because we have to try and match our product against theirs and then -- so that was -- they sell a product and then we look at something like this, that shows their product against ours, and we say, okay, so we'll assume that we would have lost a sale like that.

And certainly, the indium bonds are the older ones.  Six-inch was the old format of electrodes.  So probably we wouldn't be saying we lost some indium bond sales for 6-inch electrodes.  I don't know exactly how the accountants are working out these numbers, but it's -- potentially that would certainly be among the selection.

**THE COURT:** So your argument is not that the indium bonds weren't -- aren't substitutes for your clients' products, right?

**MR. CABELLO:** No, your Honor.

**THE COURT:** Your argument is that the elastomera (sic) --

**MR. CABELLO:** Elastomeric.

**THE COURT:** -- elastomeric-bonded devices are not substitutes.

**MR. CABELLO:** My client's are not substitutes.

**THE COURT:** Your client's are not substitutes for them. And so you want to show, based on the testing, that your client's products are not substitutes for the elastomeric-bonded devices.

**MR. CABELLO:** That's correct, your Honor.

**THE COURT:** Why do I care about the indium-bonded?

**MR. CABELLO:** Well, because you compare both, to demonstrate that it's a radically different electrode.

**THE COURT:** Well, why do I care, if you're the same as the indium-bonded? Don't you just want to know that you're different from the elastomeric?

**MR. CABELLO:** Well, your Honor, there's a little bit more history. We don't use indium bonding. We use what's called --

**THE COURT:** Something else.

**MR. CABELLO:**  -- Shrink City.  Now, they're stretching --

**THE COURT:**  No, I understand, there's a big fight about that.

**MR. CABELLO:**  Yes, there is, and so initially they took the position you're competing with our indium electrodes.  Now they're saying you're competing with our elastomeric --

**THE COURT:**  Well, they're going to say -- they're saying you compete with both.

**MR. CABELLO:**  That's right.

**THE COURT:**  Okay.

**MR. CABELLO:**  And so --

**THE COURT:**  But you don't disagree that you compete with their indium.

**MR. CABELLO:**  We don't disagree.  We don't believe that ours infringed the patent, but that's another --

**THE COURT:**  I understand that, but --

**MR. CABELLO:**  -- that's another dispute.

**THE COURT:**  -- but that's not what this is aimed at.  This is aimed at the competition.

**MR. CABELLO:**  It's aimed at the competition.  It's also aimed at the claim coverage, because we don't believe their claims cover the elastomeric-bonded.

**THE COURT:**  Okay, fine.  Then what you need is the -- is someone to testify on the quality control and the

quality assurance, and customers, and whether they tested for -- meet your customers' specifications, et cetera, et cetera, for the elastomeric products.  You don't need the ones for the indium bond -- indium bonding.

MR. CLARK:  Your Honor, if I could just --

THE COURT:  Is that right?

MR. CLARK:  Sorry.

MR. CABELLO:  Your Honor, that will be sufficient, thank you.

THE COURT:  And so you can respond to that.

MR. CLARK:  Okay.  Your Honor, let's assume that the quality control shows that indium-bonded products were shockingly bad, or the elastomeric products were shockingly bad.  How does -- I don't know how that affects the analysis, because we kept on selling these products, they kept on competing with us, and so it seems to me that that's an incidental issue.  Now, whether we had quality issues, whether --

THE COURT:  I know, but you're going to have to prove that you would have gathered all the sales that they would have done, and they can always say, well, they had these quality issues, which we don't have, and so you wouldn't have gotten all the sales that we counted.

MR. CLARK:  Your Honor --

THE COURT:  Isn't that one of the arguments?

MR. CLARK:  Well, your Honor, I mean, technically, that is an argument, I agree with you, but I think put in context, it's not, because this is not a sophisticated product. This is a piece of silicon on a piece of graphite, glued together, and it works.

THE COURT:  I'm glad it does.

MR. CLARK:  And they kept on selling that.

THE COURT:  Okay.  Number 3 --

MR. CLARK:  What's your ruling on 2?

THE COURT:  As stated, topic number 2, but only with respect to elastomeric-bonded products.

MR. CABELLO:  Your Honor, may I just be heard on one thing?  Not that I want to change the Court's ruling.  I just want to make sure the Court was aware that even to this day, Lam is producing indium-bonded electrodes.  They're not selling them in as great quantity --

THE COURT:  No, no, no, I appreciate that --

MR. CABELLO:  Okay, that's fine.

THE COURT:  -- but that's not -- this doesn't go to indium bond.

MR. CABELLO:  I'm not trying to change the Court's ruling on that.

THE COURT:  Okay.

MR. CABELLO:  That's all I wanted to do, your Honor, is clarify that.

**THE COURT:**  So third is, research, development, experimenting with respect to products -- I guess I don't understand.  This one seems way over-broad and not aimed at anything in particular at all.

**MR. CABELLO:**  Well, again, your Honor, what we're looking for is the commercial products that they contend they lost sales on, and while that's been very elusive for us, we want to understand the type of product that they contend that we competed against.

And so we'd like to see some of those prototypes or models of the commercial products.

**THE COURT:**  So you just want a prototype?

**MR. CABELLO:**  We'd just like to inspect them, your Honor.

**THE COURT:**  So this is just a prototype?

**MR. CABELLO:**  Yes.

**THE COURT:**  Okay, so this isn't a -- you just want them to produce a prototype of all the products that they claim they lost sales on?

**MR. CABELLO:**  Yes, your Honor, and --

**THE COURT:**  So why shouldn't you do that?

**MR. CABELLO:**  All right.

**THE COURT:**  In lieu of, in number 3, produce prototypes of all the devices on which you claim you lost sales.

**MR. CLARK:**  Oh, yeah, of the devices we lost --
yeah.  We've offered to produce --

**THE COURT:**  Go ahead.

**MR. CLARK:**  Sorry.  You mean samples or prototypes?

**THE COURT:**  Well, samples.

**MR. CLARK:**  I mean, we've offered samples.

**THE COURT:**  You mean samples, you don't mean
prototypes.

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  Samples.

**MR. CLARK:**  Yeah, we've offered them to you.  It's
not an issue.

**THE COURT:**  Good.  Well, that solves that problem.
So just produce samples of all Lam products which Lam claims
lost sales, instead of a witness.

**MR. CABELLO:**  And no witness, your Honor?

**THE COURT:**  No.  You said you needed product.

Number 4, R&D -- well, this is a subset of that.  So
you're just going to get them.  What's 4 about?  I didn't
really get 4.

**MR. CABELLO:**  Well, one of the elements of the
claim, your Honor, is that there was increased thermal and
electrical conductivity for the -- and so we found out just the
other day that the elastomeric bond is what's called RTD
silicone, with an E, I was told by the inventor, and that it's

aluminum-impregnated to achieve thermal and electrical conductivity.

And so we'd like to know the extent to which the electrical and thermal conductivity, which is in the claims, in the elastomeric-bonded electrodes, comports at all or is similar to the indium-bonded, which we suspect are much, much higher.  So we --

THE COURT:  Well, why do I care about that comparison between the two?

MR. CABELLO:  Because the key is, were you competing with the claimed product?

THE COURT:  Well, I understand that, but the only way you say that product A is competing with your product is you look at product A, you don't look at product B.

So your question is whether product A is competing -- the elastomeric is competing with yours.  Why are you getting into the indium at all?

MR. CABELLO:  No, we're saying, does the elastomeric-bonded electrode fall within the terms of the claim --

THE COURT:  Okay.

MR. CABELLO:  -- in other words, does it compete with the claimed invention.  So to do that, then you compare the electrical thermal conductivity --

THE COURT:  Of...

**MR. CABELLO:** -- of the indium-bonded, which presumably meets the elements of the claim, with the elastomeric --

**THE COURT:** That makes no sense. It's completely illogical. You don't figure out whether you're competing with a product by looking at a comparison of that product to a third product.

**MR. CABELLO:** Well, but your Honor, the specification of the invention does not quantify electrical or thermal conductivity. It just says it improves it. And so you have no way to match the electrical thermal conductivity that presumably the elastomeric-bonded electrode has without comparing it to some baseline, some control.

**THE COURT:** Well, but the baseline's not indium.

**MR. CABELLO:** The baseline is the claimed invention, which is the indium-bonded electrode.

**THE COURT:** No. The baseline is the invention in the four corners of the patent. The indium-bonded -- their particular product doesn't set the meaning of the claims.

**MR. CABELLO:** I understand, your Honor, but they have -- they contend that --

**THE COURT:** That they practiced the invention.

**MR. CABELLO:** -- that they practiced the invention with the indium-bonded electrode.

**THE COURT:** Well, I understand that.

**MR. CABELLO:** And the elastomeric-bonded electrode, we're saying, let's look at how well they match up, one for one.

**THE COURT:** Yeah, okay. That makes no sense to me. If you want to actually figure -- the indium bonding can't be the one that sets the baseline for what the conductivity has to be. It has to be set by the products that are identified in the four corners of the patent. Otherwise, no human being reading the patent would understand what it means.

**MR. CABELLO:** And as I mentioned, your Honor, it's indefinite, because it doesn't tell us --

**THE COURT:** Well, but that's fine. Then it's indefinite. You make that argument.

**MR. CABELLO:** Okay.

**THE COURT:** That's a separate question. So do you have experimentation regarding the thermal and electrical conductivity of the elastomeric?

**MR. CLARK:** Your Honor, I'm not aware of that. I mean, obviously, when they developed the product, it had to have sufficient thermal and electrical conductivity to work. So, you know, I presume that there's general testing to make sure, you know, you put it in a machine and you see if it works, at that level.

But your Honor, the patent specification, as Mr. Cabello indicated, doesn't actually say there's this

level -- however you measure the conductivity, if it's a number 80, and this is only number 60 in the elastomeric patent -- product, I don't know what the measures --

THE COURT:  But that's a merits argument, isn't it?

MR. CLARK:  Pardon?

THE COURT:  That's a merits argument.  That's not a discovery argument.

MR. CLARK:  Well, that's the point, your Honor. I mean, it seems to me the critical thing is what I've said at the beginning, is that the elastomeric -- I understand their argument about elastomeric, I disagree with it, but I understand it, and therefore, they're entitled to know what's elastomeric and what's indium, and I -- you know, I don't have a problem with that.

But the individual -- I mean, do they want us to measure the conductivity of the electrode and of the graphite ring?

THE COURT:  Okay, yes, they do.  So the ruling of the Court is that you can have a witness, as stated, for that topic, for the elastomeric products that Lam says it lost sales on.  I'm not saying there was testing, but if there was, they have to have a person that...

MR. CLARK:  Testing for thermal and electrical conductivity, your Honor?

THE COURT:  As stated in number 4.

**MR. CLARK:**  Actually conducted or proposed?

**THE COURT:**  "Research, development, experimentation proposed or conducted by Lam regarding the thermal and electrical conductivity for Commercial Products, this limited -- including but not limited to," et cetera, et cetera.

**MR. CLARK:**  Okay.

**THE COURT:**  I guess that they didn't have any other protos that they didn't do.  Okay, that is the end of 354.

355.  355, the hodgepodge of things you should have worked out.

So issue number 1, documents from 2003 to the present.  I have no idea what you're talking about.  Plaintiff says that there were no documents produced that were dated after 2006.  Are you saying there's no documents on any subject produced after 2006?

**MR. CABELLO:**  There's just a hand -- handful of documents after 2006, your Honor.

**THE COURT:**  Handful, by that you mean five?

**MR. CABELLO:**  That's probably an exaggeration, but I think under 20 is not an exaggeration.

**THE COURT:**  Okay.  So how could that be?

**MR. CLARK:**  Your Honor, you directed us at the last hearing to search the databases, and that's what we did. I have not independently verified that this -- I have -- from

looking at the documents, I don't believe that it's true that there's only a handful, but I can't give you the percentages after 2006 because I haven't tabulated it.

But my impression was that there was a selection, from my superficial review of these 10,000 documents, was that they --

THE COURT:  So how did you search the databases?

MR. CLARK:  I didn't -- I didn't personally conduct it, in-house counsel did, but I know that they searched the actual computer --

THE COURT:  No, but how -- what technique did they use for searching?

MR. CLARK:  Using search terms.

THE COURT:  Okay, what search terms did they use?

MR. CLARK:  I don't know exactly what they were, but certainly '456, Xycarb --

THE COURT:  Okay, so with respect to number 1 -- let me write this down.  This is docket number 355.  With respect to issue number A -- you've done number A -- you know, I want Lam to provide a list of the search terms used to search its computers for responsive documents, and meet and confer with respect to any issues that come up from that.

For future reference, you should never do a computer search without checking the search terms with the other side. It's almost *per se* a mistake, because nobody knows what you

did, and the other side will then want something that's subject to this sort of squabble where there's no certainty.  So that should take care of it.

B, documents regarding the sale of 200-millimeter electrodes.  Lam says that they produced a spreadsheet for all sales, invoice by invoice, through 2013 that presumably, I think the implication is, including their 200-millimeter electrodes.

**MR. CABELLO:**  Your Honor, we learned during Mr. Maddock's deposition just this past week that what they produced was revenue they expected to get, not revenue that they actually received.  We have seen nothing related to the cost of goods sold.  And so we continue to burrow down on this issue, and that is --

**THE COURT:**  Well, that's --

**MR. CABELLO:**  -- what --

**THE COURT:**  Can I just criticize you again, for a moment?

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  You're probably getting tired of this, but part B in your letter doesn't say anything about cost of the goods sold or anything other than saying the -- they're not producing documents relating to the 200-millimeter electrodes. Is that no longer the case?

**MR. CABELLO:**  Well, we compete with the

200-millimeter electrodes.  We make no 300-millimeter electrodes.  And so what has been produced are 300-millimeter electrodes, of which --

THE COURT:  So they haven't produced any documents regarding sales of the 200-millimeter electrodes?

MR. CABELLO:  The only thing we've seen are documents related to IBM, and they contend they lost sales to a lot of other people, and we're saying, fine, show us the money.

THE COURT:  Show us the money.

MR. CABELLO:  I'm sorry, your Honor, that was poor.

THE COURT:  So, go ahead.

MR. CLARK:  Your Honor, we've produced a spreadsheet showing every single sale of every single product --

THE COURT:  Well, he says it's the anticipated sales.

MR. CLARK:  I don't know how you can provide a list of sales that you anticipate.

THE COURT:  Yeah, I don't know what you -- what do you mean, they were expected sales?

MR. CABELLO:  Your Honor, what they did is they put on the spreadsheet invoices that they sent out.  They don't account for returns.  They don't account for discounts that they provided for other reasons.  It's just -- it is --

THE COURT:  Well, invoices usually have the discounts built into them, but go ahead.

**MR. CABELLO:** Well, it turns out that there are end-of-year discounts, depending on customer loyalty --

**THE COURT:** Yeah.

**MR. CABELLO:** -- and all of those come back in at some point, depending on how loyal the customer has been.

**THE COURT:** All right, well, that's a separate question from saying... So you will -- okay, fine. So this is a classic one you should have been able to work it out.

As far as I can tell, what was produced was, based on invoices, what the sales were, including 200-millimeter electrodes. That's right, isn't it? It doesn't account for discounts that might have come in later and that kind of stuff, but it was the invoices that were sent to the customers for the sales of the 200-millimeter electrode, right?

**MR. CABELLO:** Yes, your Honor.

**THE COURT:** So when you said to me, we don't have any documents on the 200-millimeter electrode, that was false.

**MR. CABELLO:** Well, your Honor, what I'm talking about are documents to customers, other than IBM, documents to customers relating to the 200-millimeter electrode.

**THE COURT:** So what...

**MR. CABELLO:** The 300-millimeter electrodes are irrelevant.

**THE COURT:** So you're not talking about -- so is this -- we're getting back to the... So documents for the

customers, I guess I don't understand that.  Is this the discount issue?

MR. CABELLO:  No, your Honor, what it is is communications with the customers relating to pricing, relating to discounts, relating to the head-to-head competition that they had ongoing with my client, Xycarb, and what they contend to have had to make a lot of concessions.  We're saying, fine, where is the documentation of these concessions?  You say you had to discount these products.  Obviously, there were communications with your customers leading up to those --

THE COURT:  That's what I'm saying.  It's the discount issue, right?

MR. CABELLO:  Yes, part of it is the discount issue.  The other is the cost of goods issue.

THE COURT:  Okay, so it has nothing to do with what you actually put in the letter.

MR. CABELLO:  Well, we say they refuse to produce documents that are central to the damages theory, and --

THE COURT:  Well, yeah, okay, fine.  The whole letter is about that, but you go on to say exactly what that is and you don't say one word about, they didn't produce the discount documents and they didn't produce cost of goods sold.

You all are going to have a better job of communicating here.  So let's drill down on this a little bit.

Have you produced all the documents yet regarding

the cost of goods sold?

**MR. CLARK:**  Your Honor, that's --

**THE COURT:**  On the 200-millimeter documents.

**MR. CLARK:**  I'm sorry.  That spreadsheet includes cost of goods sold as a percentage.  There is a column, and that was something that was added to the spreadsheet after hours, before your last time.

**THE COURT:**  And how is that cost of goods sold calculated?

**MR. CLARK:**  It's -- we have a witness who's going to be presented on Monday the 25th, who's the person who's going to talk about marginal profits -- sorry -- marginal expenses -- operating expenses which are variable, and operating expenses which are fixed, and how they should be applied to the gross profit, because that spreadsheet only gives gross profit.  So it has the selling price, it has the cost of goods, then, and you can then calculate the net profit.

**THE COURT:**  Gross.

**MR. CLARK:**  -- the gross profit, I beg your pardon.

**THE COURT:**  All right.

**MR. CLARK:**  So Mr. Eric Goodman is on board to testify in response to one of the existing 41 topics --

**THE COURT:**  Right.

**MR. CLARK:**  -- in the 30(b)(6) notice, about those exact subjects.

THE COURT:  And is there other documentation that supports his testimony?

MR. CLARK:  He's created two spreadsheets, your Honor, which --

THE COURT:  Are there other documentations preexisting which would show that these are the actual situations for the company in terms of what actually happened?

MR. CLARK:  Yeah, your Honor, we have also produced -- and I can't remember what the contract is called, whether it's a supply contract or whatever it's called, but the discount issue, the practice, as I understand it, is you go to a customer --

THE COURT:  Well, no, no, no, cost of goods sold. Is discount within the cost of goods sold or not?  That's not on the invoice.

MR. CLARK:  No, no.  No, it's not.  It's not.

THE COURT:  So let's stick to cost of goods sold for a moment.  Do you have documents that show that the underlying basis for this guy's calculation of what the cost of the goods sold is correct?

MR. CLARK:  What we have is what's known as a "standard cost" that Lam calculates and puts into its financial statements, and that number is in the spreadsheet.

THE COURT:  So the standard cost that they put into the -- and they calculate, do they have documentation showing

how they calculate it, and that the basis for those calculations are true?

MR. CLARK: I'm not sure whether Mr. Goodman is going to deal with that issue, because I just saw his spreadsheets yesterday.

THE COURT: All right. So why shouldn't you produce documents sufficient to show the cost of goods sold --

MR. CLARK: Calculation --

THE COURT: -- and the basis therefor, with respect to the lost sales products?

MR. CLARK: So in other words, you want something to support the line item in the spreadsheet.

THE COURT: Yeah, and on the discount issue -- well, we talked about this one before.

MR. CLARK: We did. We talked about bundling, your Honor, and you directed to us provide a reasonable selection of documents that demonstrated how Lam did its bundling, and I don't believe it's true that the customer gets cash back at the end. I believe that it's negotiated up front. I mean, subject to correction, that's what I understand, that you present this so-called bundling thing and you say, this is what we'll charge you for all the products for this period of time, and you enter into a contract, and that includes the discounts in that bundle, and then those are the prices that are charged.

And we have produced more than a reasonable

selection of the bundling documents, and you directed that there be a deposition on those spreadsheets, including that spreadsheet, but when we produced our witness, he was not asked about bundling. But we have produced substantially a number of documents about bundling, as you've directed previously.

THE COURT: Right.

MR. CLARK: And we also produced as many of the contracts --

THE COURT: And the problem, as I recall, in finding information was that it was in sort of -- it was done on a case-by-case basis by the salesperson in e-mails to the customers.

MR. CLARK: With the spreadsheet, your Honor, the whole list of parts are then existing price, and they propose a new price, and then --

THE COURT: Right.

MR. CLARK: -- and then investigated there would be agreements, and we produced the documents. At least -- I don't, a number of agreements. We haven't certainly produced every single agreement we've completed in the last 10 years, but produced whatever agreements could be found. And we continue to find them and continue to produce them as we find them.

THE COURT: Okay.

MR. CLARK: Because our own experts want those

documents, too.

THE COURT:  So why isn't that enough, plus you take the deposition?

MR. CABELLO:  Well, your Honor, first of all, we did depose Mr. -- I believe it was Maddock, this past week, on the issue of bundling.  He knew very little about bundling.  What he did testify to is the tying of unpatented products to the patented product, but it was only in one instance where there were documents, and we believe that there are many other similar PowerPoint presentations and presentations where the unpatented product was tied to the purchase of the patented product or vice versa.  And so we believe --

THE COURT:  So why do you believe that?

MR. CABELLO:  Because Mr. Maddock testified, at least with respect to this one particular document, that there was -- he called it a "hinge" document, he said that it tied the unpatented product to purchase of the patented product, and then he attempted to --

THE COURT:  What was the -- what was the buyer?  Who was the buyer?

MR. CABELLO:  I don't know, your Honor.  I didn't take that deposition.  I was given a summary of it and I didn't get into the details of the buyer.  But it was only as to one of those buyers, and so Lam has many customers and we believe that there has been this tying.  We want to understand the

tying, because it goes to the whole issue of profitability.

**MR. CLARK:**  Your Honor, Mr. Adelsheim defended that deposition, and it wasn't Mr. Maddock, it was Mr. Driscoll --

**MR. CABELLO:**  I'm sorry, I misstated that.

**MR. CLARK:**  -- and Mark Adelsheim actually defended, and would you let him respond to that, your Honor?

**THE COURT:**  Just very briefly.

**MR. ADELSHEIM:**  Good morning.  So Mr. Driscoll provided testimony to the extent that the market share agreements that they had with their customers were, most of the time, orally negotiated with -- so he was a point of contact for many of his customers within North America, and the statements that counsel for Xycarb was making is a little bit misrepresentative of Mr. Driscoll's testimony during that deposition, that the hinges -- what he testified was that he was given direction to try to maintain the price of the electrodes in his sales to his customers.

**THE COURT:**  So there were hinge documents, right? There were documents --

**MR. ADELSHEIM:**  The market share agreements?

**THE COURT:**  There were documents wherein the price of the electrodes were tied together.

**MR. ADELSHEIM:**  There were documents where the price of the electrodes were set with the customers.

**THE COURT:**  Set together.

**MR. ADELSHEIM:**  Set together with other products.

**THE COURT:**  I see.  Bundling.

**MR. ADELSHEIM:**  Correct.

**THE COURT:**  Okay, and you've produced one such document.

**MR. ADELSHEIM:**  I believe we've produced about four or five of those by this point.

**THE COURT:**  Okay.

**MR. CLARK:**  Your Honor, I produced another four or five last -- this last week, which --

**THE COURT:**  And why aren't we producing all of this?

**MR. CLARK:**  No, we did produce them, but then we found some more, and we produced them --

**THE COURT:**  No, but I understand.  Why shouldn't you produce all of them, all of the discount bundling, whatever you want to call it?

**MR. CLARK:**  Ten years, I mean, I -- it's been -- yeah.  We've produced whatever we could find, and we must have produced, I would guess, at least 20.

**THE COURT:**  All right.  So I want you to produce all documents referring or relating to bundling of the products that -- bundling of products which includes at least one product on which you contend there was a lost sale.

**MR. CLARK:**  Now, your Honor, do you -- is that limited to -- you know, these things are presented in

spreadsheet form, with -- you know, with all the bundled products are shown on a spreadsheet, including the --

THE COURT:  Well, I don't know, whatever the e-mail said.  E-mail says, this is how we're going to do it.  This is another one where you probably ought to meet and confer on your search terms.  I'll put that in there --

MR. CLARK:  I'm just concerned about the burden of that, your Honor.

THE COURT:  So am I, but it seems directly relevant.

MR. CLARK:  But -- I'm sorry, your Honor -- if they were proposed but were never accepted, with respect, how could they be relevant?  The relevant document would be the contract that resulted from that and showed the actual discount or the price.

THE COURT:  Well, if you've got contracts that can -- that are -- you mean the invoice.

MR. CLARK:  No, I mean the actual -- because apparently what happened is, as Mr. Adelsheim has said, sometimes it's an oral agreement, but sometimes they actually have formal agreements.

THE COURT:  Well, but sometimes it's an oral agreement.

MR. CLARK:  So, of course --

THE COURT:  Or an e-mail agreement.

MR. CLARK:  -- the best evidence is the proposal

that gets accepted, but the proposals that are rejected, what possible relevance --

THE COURT: Well, if it's going to be harder for you to just pull out the proposals that were accepted, then get all the proposals and all the information about it, and we can fight about whether they were accepted or rejected or they used the discount or they didn't use the discount.

I want the history on that, because I'm not going to prejudge whether or not it was done or not done, especially in a situation where you're saying some of them were oral.

So, C, information regarding filing of patent and lawsuits. So Lam says all non-privileged information has been provided. That's what you wanted, right, them to say that?

MR. CABELLO: Yes, your Honor. We were also looking for a log of whatever was withheld.

THE COURT: Well, they're going to do a privilege log.

Did you do a privilege log yet?

MR. CLARK: I did a privilege log, yeah, up to the date of filing, your Honor.

THE COURT: Up to date of...?

MR. CLARK: Filing the lawsuit.

THE COURT: A privilege log up to the date of filing the lawsuit.

MR. CLARK: Which is what you directed me to do.

**MR. CABELLO:**  Your Honor, I have a copy of the privilege log, and the privilege log that I have here from Mr. Clark, dated July 10th, 2014, which followed the last meet-and-confer before this Court, or the last hearing before this Court, relates to redacted licensing documents, which we contend separately are improper --

**THE COURT:**  Well, so was there anything actually withheld?

**MR. CLARK:**  There was one memo, your Honor.

**THE COURT:**  And it's on there?  It's on the privilege log?

**MR. CLARK:**  It's on there, yeah.

**THE COURT:**  Okay, well, that's fine.  You can point it out to him.  Not right now, later.

D, information regarding the development and implementation of technology into products.  So this is -- I'm not sure what to do about this.  This is the one where --

**MR. CLARK:**  This is really duplicative of B, your Honor.  It's what we were talking about the bundling in.

**THE COURT:**  No, no, no.  Number D?

**MR. CLARK:**  Oh, I'm sorry, I'm looking at E.

**THE COURT:**  No, E is regarding --

**MR. CLARK:**  I'm sorry.

**THE COURT:**  -- I think, but D, we haven't.  This is the testing, trials, research, development and implementation

of the subject matter of the '266, et cetera, et cetera.  So...

MR. CLARK:  This is the Patent Local Rules again, and we produced what was under the rules, and you ordered us to produce, in addition to that, anything in the patent files.

THE COURT:  Well, this is not the patent files.  This is the question about....  So have you produced all the specs for the Lam products?

MR. CLARK:  Yes.

THE COURT:  You produced all those, especially for the Lam products.

MR. CLARK:  Your Honor, it's not every single spec on every single product.  It's a couple of drawings per product, with the specification on the right-hand side which says, this is graphite, this is electrode, this is indium-bonded or whatever it is, and the dimensions.

THE COURT:  For each of the products.

MR. CLARK:  For each of the products.

MR. CABELLO:  Your Honor, may I be heard on that point?

THE COURT:  Yeah.

MR. CABELLO:  First of all, your Honor, with respect to the drawings, the drawings reference a bill of material.  There is a bill of material on each drawing, and that references some further drawings.

When I deposed the inventor and asked him very

specific questions about the makeup of the electrodes, he says, well, we'd have to look at the bill of material, the material that is listed in the bill of material. I asked him about processes. He says, those would be part of the bill of material. I asked him about patent markings. He says that would be part of the bill of materials.

When I asked Mr. Clark to furnish me the materials that are referenced bill of materials, he says, I don't have to. So --

THE COURT: So what you want is the bill of materials for each of the products?

MR. CABELLO: Well, those that are encompassed in the drawings. I mean, the drawings provide some detail, but they don't provide all of the detail related to the electrode.

THE COURT: And they reference -- well, I missed it, perhaps you said it. The bill of materials is referenced in the drawings?

MR. CABELLO: Yes, your Honor. They have a specific number. I don't know if it's a drawing or procedure or something, but there are six- or eight-digit numbers in the bill of materials that relate to documents that have not been furnished. Those are part of each of the drawings.

THE COURT: So there are other -- so in the drawings that Mr. Clark's referring to, these drawings which have set forth some of the specifications of the products, there are

references to underlying documentation.

MR. CABELLO:  Yes, your Honor.

THE COURT:  Okay, and you haven't produced -- have you produced the underlying documentation referenced in those?

MR. CLARK:  Your Honor, there's no possible relevance to that.  I mean, we produced those drawings and specifications as a result of meet-and-confer here last time, and that was the agreement that we produce something that indicated which products were in the indium-bonded and which products were elastomeric-bonded, and your Honor, one must bear in mind that the infringing product is an identical --

THE COURT:  How big of a deal is this?  Talking about four or five documents --

MR. CLARK:  No, your Honor, there's something like -- I think there are about 15 products involved --

THE COURT:  I understand that, and four or five references per one?  Two references?

MR. CABELLO:  I believe there was two, maybe three at most, your Honor.

THE COURT:  Thirty pages?  Thirty documents?

MR. CLARK:  Your Honor, if there was 30 pages, I wouldn't be resisting, but I suspect these things go through, in most iterations, each of those drawings that we produced has at least a half a dozen different iterations of the product. So it won't be 30 documents.  I suspect it will be 300

documents, and they'll be buried 20 years ago, and for what, your Honor?

The only thing they need to know, as we've discussed already, is whether indium-bonded or elastomeric.  These products are direct replicas, in dimensions and everything, as they necessarily must be.

THE COURT:  They also want to see whether or not -- they want to have some -- more information so that they could take potshots as to whether they work, whether yours is better or worse than theirs.  They want to do more than just say whether it's indium-bonded.

Isn't that right?

MR. CLARK:  If I could give a for-instance, your Honor --

THE COURT:  I mean, I understand why -- isn't that what you want this for?  Why do you want this?

MR. CABELLO:  Well, there are other reasons, your Honor.  For example, the inventor said -- I asked him about patent marking, and he said, well, I would have to look at the bill of materials, because that tells me how these electrodes are marked, which patent markings pertain to each electrode.

Now, Mr. Clark has taken the position that the '266 patent covers both the indium and the elastomeric bonding --

THE COURT:  Yeah.

**MR. CABELLO:**  -- although we have seen representations from Lam's counsel that the '266 patent covers indium and the '577 patent, which is not in suit, covers elastomeric.  We want to test that, by looking at how Lam chose to mark its products.  Did it mark the indium with the '266 and the elastomeric with --

**THE COURT:**  So you just want information regarding patent marking, is that what this is about?

**MR. CABELLO:**  That's one of them, your Honor.  The other is, we get back to the makeup of these, and to that end, your Honor --

**THE COURT:**  Again, why do you want that?

**MR. CABELLO:**  Well, we don't know what we don't know.  The inventor has told us the details of the assembly, the details of the assembly of the electrode --

**THE COURT:**  And why does it matter to you?

**MR. CABELLO:**  Well, it matters a lot, your Honor, because what we learned during the deposition was that Lam never assembled these electrodes, not back in -- in 1990 when the invention was conceived, and not today.

**THE COURT:**  They mark them from somebody else, but so what?

**MR. CABELLO:**  The magic, the key secret here is how these devices are bonded using indium solder, and what I learned just this past week was that Lam doesn't know.  Why?

Because they send the graphite piece and they send the silicon disk to SMI, and SMI has the magic to bond these two.

THE COURT:  And what are you going to prove out of that information?

MR. CABELLO:  Well, we're going to prove, first of all, that they did not reduce the invention to practice. There's a real enablement issue related to the invention. There's the --

THE COURT:  Yeah, but you've already got the information on that.  What's next?

MR. CABELLO:  There is a derivation issue, because it appears -- and this goes back to 1988, when one of the inventors went to an industry show called SEMICON, in 1988 this inventor went and he made a notation --

THE COURT:  No, I saw that, but what's that got to do with every detail for every product in the bill of -- the underlying documentation for the specification?

MR. CABELLO:  Your Honor, if we can -- I'm willing to take the bills of materials that are referenced in the drawings that were actually produced.  Now, Mr. Clark raises a point --

THE COURT:  What are you going to do with them?

MR. CABELLO:  He says, you know, we'll have to produce hundreds and hundreds of documents.  All we want to establish is how these electrodes are assembled.

THE COURT:  Why?

MR. CABELLO:  Well, again, it goes to whether or not the elastomeric-bonded electrode truly competes with the indium.  So that's one issue.  How is it assembled?  By whom is it assembled?  What do they use?

You know, the patent talks about using an epoxy to bond it.  Well, we learned just recently that there's no epoxy used.  It's a silicon bonding that vulcanizes at room temperature, according to the inventor's own words.

And so we'd like to see what the history was in bonding.  Did they bond initially with an epoxy and now moved to a self-vulcanizing adhesive?

THE COURT:  Let me hear from Mr. Clark on this.

MR. CLARK:  Your Honor, that's an awfully large smorgasbord.  The inventor just testified this week as to all those issues.

THE COURT:  Yeah, I understand that, but they still can get documents on those issues.

MR. CLARK:  Yeah, but the as far as the -- the patent actually includes any method of bonding, and it includes -- it talks about soldering, brazing, adhesives, all such --

THE COURT:  It may, it may not.

MR. CLARK:  So it's --

THE COURT:  There's a big fight as to whether it

includes all or any method of bonding.

**MR. CLARK:**  Those are the ones that are specifically read out as embodiments, the soldering, brazing and adhesives.

**THE COURT:**  Okay, but it's not any method of bonding.

**MR. CLARK:**  No, no, no, and there are huge arguments around that.

**THE COURT:**  Right.

**MR. CLARK:**  But one thing, certainly indium is covered and certainly adhesives are covered, but we don't have to agree on that --

**THE COURT:**  Right.

**MR. CLARK:**  -- for the purpose of this proceeding. Your Honor, it gets back to your question:  Why does he really need the intricate details of this simple, very simple product? What could he possibly learn from that beyond the fact of which is -- you know, what's elastomeric and what's indium?

And, you know, I understand the marking issue, raised for the first time this morning at counsel table and, you know, I think we would probably have to produce documents about showing when we marked and how we marked.  But that doesn't mean that we should be producing every single specification or drawing ever produced by every single product over a period of something like 20 years.  It's just far too burdensome.

THE COURT: Okay. So what you're going to produce is any documents that are referenced in the product specifications you've already produced, and documents sufficient to show when and how you marked the products.

As to number E, I think we've dealt with that. That's a discount issue.

As to number F, financial documents -- let me just turn the page, here in my notes -- regarding sales, so what do you want and why do you want it?

MR. CABELLO: Your Honor, what we're looking for is substantiation of the spreadsheets. We understand the spreadsheets, we've been through the spreadsheets, but when there's a number listed in the spreadsheet, for example, our profit is X, what's it based on? What's included in the cost of goods sold? We haven't seen the cost of goods sold, but when we get --

THE COURT: Okay, well, I've already heard something on that.

MR. CABELLO: Okay.

THE COURT: So why shouldn't you have to produce documents sufficient to demonstrate how the spreadsheet was calculated and if the numbers were correct?

MR. CLARK: Your Honor, the problem that happened last time is, I tried to ask them what those documents might be --

**THE COURT:**  Well, I don't need -- he doesn't want what they might be.  You will know what they are.

**MR. CLARK:**  Well, no, we don't, your Honor.

**THE COURT:**  Why?  You made the spreadsheet.

**MR. CLARK:**  Yes, we took invoices, and we took invoices and we inputted them into the SAP system, and the invoice line item is -- so do they want every invoice?

**THE COURT:**  Okay, so one document is the invoice. He doesn't want every invoice.

**MR. CLARK:**  Yes, but your Honor --

**THE COURT:**  I bet he doesn't want every invoice.

Do you want every invoice?

**MR. CABELLO:**  No, your Honor.

**THE COURT:**  Okay.

**MR. CABELLO:**  We'd like to go through a sample calculation, and they can pick which calculation it is, bring the invoices, bring the substantiation, and then we'll go through a sample calculation, and then we can ask the witness: Are all the entries in here reflective of this same sample calculation?  I mean, we've got to get -- nail down this Jell-O.

**THE COURT:**  So if I ask them to produce documents sufficient to demonstrate a sample calculation for one invoice, I guess it would be --

**MR. CABELLO:**  Well, it would be for one sale,

whatever, your Honor, just so we can see it coming --

THE COURT:  -- for one sale --

MR. CABELLO:  -- talked about them.

THE COURT:  -- reflected in the spreadsheet, that you produced -- let me see.  How shall I refer to this spreadsheet, so that we can identify it and you'll know what it is?

MR. CLARK:  It's perhaps the spreadsheet including the cost of goods, because there is only one that includes cost of goods.

THE COURT:  Spreadsheet provided by Lam which includes cost of goods.  Okay.

THE CLERK:  That's fine, your Honor.

THE COURT:  Okay.  G, documents in storage.  I'm not making you go into storage, so that's fine.  G is denied.

MR. CABELLO:  Your Honor, may I be heard on, just --

THE COURT:  No.  No, we've been through this before.  I went through last time.  You weren't here.  We've been through the burden issue, and what was readily accessible and what was readily not accessible.  I'm not going to re-hear argument on that.

H.  H is Interrogatories 1, 3 and 4.  I don't know what this is about.  They told you -- is this just, you want to know what information was lost?  Is that what you're saying?

MR. CABELLO:  No, your Honor.

THE COURT: I mean, they gave you information which basically says, we don't know this, we don't know this, we don't know this, we don't know this. My guess is that binds them, and they go to trial, they're never going to be able to show this, this and this.

MR. CABELLO: Let me give you an example. Interrogatory number 1 calls for conception and reduction to practice.

THE COURT: Right.

MR. CABELLO: Basically, the same kind of information that's required that they turn over -- or that's required in the Local Patent Rules.

THE COURT: Of course.

MR. CABELLO: And yet, I learned from deposing the inventor just this past week all of the details about SMI, and I've asked Mr. Clark to provide me with communications they had with SMI. I've asked them to provide me with purchase orders and their dealings with SMI, because SMI is the linchpin in this invention, and so it goes to the whole issue of derivation, it goes to the whole issue of reduction to practice, and it goes to the issue of invention.

THE COURT: So just tell me exactly what you want in response to Interrogatories 1, 3 and 4.

MR. CABELLO: Well, certainly with respect to Interrogatory number 1, we want everything dealing with the

conception and reduction to practice, and that means SMI communications and documents.

THE COURT:  So you want --

MR. CABELLO:  SMI, and then they had another vendor called Poco, they had a vendor called Bullen early on, and then they had one other --

THE COURT:  How do you spell Bullen?

MR. CABELLO:  B-U-L-L-E-N.

THE COURT:  Uh-huh.

MR. CABELLO:  And Bullen, not predecessors, but the entity that sold the same thing Bullen sold to them before they started buying from Bullen, and I don't know the name of that entity.  And so --

THE COURT:  And what are these entities?

MR. CABELLO:  Well, Bullen and the entity that sold --

THE COURT:  What did these entities do for Lam?

MR. CABELLO:  They sold the disk.

THE COURT:  Sold --

MR. CABELLO:  The semiconductor disk that forms part of the electrode.  Poco, as I understand it from talking to --

THE COURT:  So they didn't make the invention, they put it together.

MR. CABELLO:  They didn't.  They sold one component.

THE COURT:  They sold one component.

**MR. CABELLO:** Poco sold the graphite disk, which is the second component. Mr. Clark has referred to this as a two-component device. Each one of these entities shipped their product to SMI, and SMI, and its secret sauce, bonded one to the other.

**THE COURT:** And what do you want? You don't want every communication with SMI.

**MR. CABELLO:** I'd like the communications with SMI before the patent was filed, your Honor.

**THE COURT:** About what?

**MR. CABELLO:** About who was contributing what to this invention, about who was doing what to come up with this bonded device.

**THE COURT:** So you want -- so what you want in response to 1, 3 and 4 is communications with SMI before the filing date of the patent, regarding the invention.

**MR. CABELLO:** That's correct, your Honor.

**THE COURT:** Let me just write down what you want.

**MR. CABELLO:** Your Honor, we're using SMI as a placeholder, but...

**THE COURT:** Well, but SMI is the one who puts it together.

**MR. CABELLO:** Yes, your Honor, and if push comes to shove, I will settle for those communications.

**THE COURT:** Good. Well, we're pushing and shoving

here.

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  And this is the filing date of the predecessor of the '266.  Is that --

**MR. CABELLO:**  That's correct.

**THE COURT:**  What is that?  What's the number?

**MR. CABELLO:**  Let me give you -- it's the --

**THE COURT:**  You'll probably know it.

**MR. CLARK:**  '456 patent.

**MR. CABELLO:**  '456, and the filing date is September 18th, 1990, and I believe the relevant inquiry period is May 1988.

**THE COURT:**  Well, I'll just say, before the...  So he wants communications with SMI before the filing date of the patent regarding the invention.

**MR. CLARK:**  I'll make those in relation to these interrogatories, not document requests, but I'll -- I understand, but we'll get it done.

**THE COURT:**  Good observation, but let's...

**MR. CLARK:**  Your Honor, if they exist, they'll be produced.  I have not discovered anything that exists --

**THE COURT:**  Great.

**MR. CLARK:**  -- and the inventor said that he no longer had any files relating to his communications with SMI.

**THE COURT:**  All right.  Let's see.

MR. CABELLO:  Your Honor, I do have one additional fact that the Court should be aware of.  When I asked the inventor what had happened to the documents, he said, "I thought Lam had won this case back in 2003, so I've destroyed my documents."

THE COURT:  Well, then, you've got testimony from the inventor that the documents were destroyed.

Interrogatory 5, you want a claim chart showing where in the specification -- want a claim chart -- for each asserted claim, that Lam identify in claim chart form the portions of the spec that provide written descriptions, enabling disclosure and disclosure of the best mode.

So this is a contention interrogatory.

MR. CABELLO:  It is, your Honor, and I believe it's also part and parcel of 3-1(g).

THE COURT:  So what's wrong with -- I can't remember what you said about 5.  What's wrong with...?  Well, these, we haven't even talked -- these are the two nobody has brought up before.

MR. CLARK:  Yes, this is the first time 5 has been in dispute.

THE COURT:  Okay.  All right, so --

MR. CLARK:  And the response was served in October, but that -- it just -- to give you an idea of --

THE COURT:  But you're going to be able to -- this

one's easy.  You guys can work this one out.

MR. CLARK:  Well, your Honor, these are all defenses of invalidity.  I don't have any affirmative duty to adduce evidence on these issues.

THE COURT:  Yes, you do.

MR. CLARK:  The responsive evidence, I have to... What they do is they say --

THE COURT:  You're saying, what do you do...  So, he defends.  He says, I'm not -- this patent fails to provide the best mode.

MR. CLARK:  Because of...

THE COURT:  And what's your response?

MR. CLARK:  Well, he has to say that, because of. Then we can respond.

THE COURT:  No, forget it.  That's nonsense. Everybody's got to show their cards.  So --

MR. CLARK:  Because we're shooting in the dark.  We have to exclude every possible defense that he could possibly come up with.

THE COURT:  No, no, he says there's no best mode disclosed.  You're going to say, yes, it's right there.  This isn't one of those.  He's saying, best mode, written description; so you're going to say, written description is right there; and enabling disclosure, here's the enabling disclosure.  I'm going to do those three, on the face of the

patent, and you're going to be able to point to them.

**MR. CLARK:**  Okay, fair enough.  I'll do that.

**THE COURT:**  Okay, so as to Rog 5, respond to it, identifying where in the spec, for each claim --

**MR. CLARK:**  Each asserted claim.

**THE COURT:**  -- each asserted claim, the written description, enabling disclosure, and best mode are disclosed.

So additional points, it's like, 14 additional points that you haven't even talked about, and I'm not going to go through those one by one.  You're just going to meet and confer on those.

**MR. CLARK:**  Your Honor, could you deal with the issue with regard to the seven-hour deposition limit? Because --

**THE COURT:**  Well, that's -- we'll get to that.

**MR. CLARK:**  I'm sorry.

**THE COURT:**  That's in one of the other letters.

**MR. CLARK:**  Oh, you said, the other points in this document.

**THE COURT:**  No, no, we're just done with that one letter.

**MR. CLARK:**  Oh, okay.

**THE COURT:**  Oh, no, no, no.  We're just done with 355.  So now we're on to 356.  So this, 356, and eventually we get -- 366 is the hours.  We'll get to that next.

So 356 asks for an update of the spreadsheet that was provided for Interrogatory 17 to include post-2010 details, sales details, and what was interesting to me is that the basic point was that Xycarb had agreed to do that and that, in response, Xycarb is now saying not that they didn't agree to do that, but that they don't have to do it.  Right?

MR. CABELLO:  Your Honor, I believe what we're saying is that that information has been furnished.

THE COURT:  Okay, but I don't care.  We're now on the honesty and integrity of counsel issue.  When counsel -- and I know it's your predecessor -- says, I promise to do something, you must do it.  So there's no issue.  I don't get into the details.  Once you people work out a detail, you must comply with your agreements.  Gotta do it.

So unless there is evidence that you complied with the agreement, which I don't -- that's not what you were about to say, you were going to say the information is contained in other places -- you can't defend against it.

MR. CABELLO:  Right.

THE COURT:  Okay?  So I'm going to order, with respect to the Interrogatory 17 -- and I think it's for both of them, and the 61 spreadsheets -- well, let's do them one at a time.  Interrogatory 17, spreadsheets updated to include sales post-2010.

As to interrogatory 16 -- 61?

**MR. CABELLO:**  Your Honor --

**THE COURT:**  -- 61, and I'm not going to make somebody appear for a deposition on those particular line items.  So there will be no further depositions on this subject.  I mean, I'm not going to order somebody to reappear to testify as to this spreadsheet.

Let me just break that down.

Okay, so then we are going to do --

**MR. CLARK:**  May I just clarify one issue there? Because they've said that if they had to comply with this, they would basically just take the list of sales and they would give us the list of sales back.

**THE COURT:**  So wait, we're now on Interrogatory 61?

**MR. CLARK:**  Yes, your Honor.  And of course, what we are asking for is a list of -- in a similar format for importation, because otherwise, there's no way we could possibly check that everything was imported, has been accounted for in the spreadsheet of sales.  So it's no good simply readjusting the sales spreadsheet and saying, this is what we imported.

**MR. CABELLO:**  Your Honor, may I be heard on this issue?

**THE COURT:**  Yeah.

**MR. CABELLO:**  First of all, I would like for the Court to clarify with respect to Rog number 17.  Sales past the

expiration of the patent till what date?  Because I'm unclear as to what's the --

THE COURT:  Well, let's go to the end of 2013.

MR. CABELLO:  Very well, your Honor.  With respect to the importation, your Honor, Mr. Spit, the Chairman of the Board of Xycarb Ceramics, Inc. testified that there was no inventory, and Mr. Clark will have an opportunity to depose the managing director of Xycarb Ceramics, Incorporated on Monday, I believe, in Houston, and I have talked to the managing director, who has further confirmed that electrodes are imported after they've been sold.

So when they get an order from a customer in the United States, they place the order with the company in the Netherlands; the company in the Netherlands ships it to the U.S., and they ship it on to the customer.

And so, you know, they're not being stockpiled, and so that's why the sales --

THE COURT:  So that's what you mean by, there's no inventory.

MR. CABELLO:  I'm sorry?

THE COURT:  That's what you mean by, there's no inventory.

MR. CABELLO:  There's no inventory.

THE COURT:  So why is this useful?

MR. CLARK:  Because it determines whether this

spreadsheet is accurate, your Honor, whether they've honestly disclosed all of the sales in the United States.

THE COURT:  Well, so why isn't that true?

MR. CABELLO:  Well, your Honor, he deposed Mr. Spit. Mr. Spit testified as to those numbers.

THE COURT:  Well, but he gets to test them by looking at documentation.

MR. CABELLO:  And the point is, your Honor, that there is no separate documentation on importation that I'm aware of, and he can certainly ask the managing director on Monday, but --

THE COURT:  Well, if there's no separate --

MR. CABELLO:  -- that's what I'm being told.

THE COURT:  If there's no separate documentation -- the only reason this would be useful is if there's actual documentation.

MR. CLARK:  Well, your Honor, every time --

THE COURT:  Because my guess is, if all you say is, give me a spreadsheet, he'll give you a spreadsheet, and it will be identical to the sales spreadsheet, because that's what they know; unless there's actually some separate kind of documentation, importation separate from the sales document.

MR. CLARK:  Your Honor, I can't remember exactly what the testimony was, but here's a company, a separate company in Holland, that is transmitting goods to a related

company in the United States.  There must be an invoice or some documentation --

THE COURT:  So why don't you have any import documents?

MR. CABELLO:  I don't know, your Honor.  I'm told they don't exist.

THE COURT:  All right, well, that's got to be false. I don't believe that they don't exist.

MR. CABELLO:  All right, and we --

THE COURT:  You can't import technology into the United States without some documentation.

MR. CABELLO:  We can test that Monday, your Honor, and if there are documents, we're happy to produce them.

THE COURT:  No.  No.  If somebody says, at a deposition, we import these documents (sic) without any customs documentation, without any importation documents, from outside the United States, are you going to think that's true, or are you going to look at that sceptically and say, he must be misunderstanding what I mean by import document?

MR. CABELLO:  Well, again, your Honor, I don't know --

THE COURT:  So here's what I'll do.

MR. CABELLO:  Okay.

THE COURT:  All right, I'm going to ask -- you're going to have to do a diligent search for any documentation --

you're not going to produce it all -- documentation regarding the importation of the products at issue, and when you find it, produce a spreadsheet of the importation, of the imports.

Okay, docket number 366.  So -- really?  We're fighting about number of hours?

**MR. CLARK:**  Your Honor, I was shown no flexibility at all, and now they start to take depositions, they suddenly want the rules that we agreed upon, solemnly and repeated over and over again, to be renegotiated, and it's just not fair.

Now, if they could show good cause why they need to redepose --

**THE COURT:**  Really?  You didn't show...?  You wouldn't know.

You didn't show any flexibility on hours?

**MR. CLARK:**  If they came to me and said, we need another three hours --

**THE COURT:**  No, but did they not show any flexibility on hours with you?

**MR. CLARK:**  No, no.  No.  At every break, they asked how much time was expired, and announced what the remaining time was, and that happened both days, both depositions.

**THE COURT:**  Well, did you ever ask for more time and they turned you down?

**MR. CLARK:**  No, I knew that.  I knew we had a deal.  The deal was seven hours.

THE COURT:  Well, that's different.

MR. CABELLO:  Your Honor --

THE COURT:  That's different.

MR. CLARK:  Yeah, I mean, I was --

THE COURT:  That's not showing lack of flexibility.

MR. CLARK:  No, no.  Oh, no, no, I didn't ask them for extra time.  I knew --

THE COURT:  Well, then, how do you know that they wouldn't have given you extra time?

MR. CLARK:  Well, it was implicit, your Honor, in the fact that every -- that time was being counted down, like a launch of a rocket.

THE COURT:  Fair point.

MR. CLARK:  And your Honor, unfortunately, as you observed at the beginning of this case, this is not a case in which much quarter has been given because, as is explained in one of the filings with you, Xycarb is upset we didn't take their settlement offer.

MR. CABELLO:  Your Honor --

MR. CLARK:  We're getting punished for that.

THE COURT:  No, no, but that was a ridiculous comment.  And by the way, next time someone puts something like that in this -- in a document to this Court or to the District Court, I will sanction them for violation of the rules regarding settlement proposals.

**MR. CABELLO:**  Very well, your Honor.

**THE COURT:**  So --

**MR. CABELLO:**  Your Honor, with respect to --

**THE COURT:**  So I don't understand why we're fussing about this.  I want -- you all -- today is today.  You've got two weeks' worth of depositions left, probably 25 depositions in those two weeks, or some insane number you have to do.  You've got a lot of work to do.  Everybody's going to have to be flexible.  You're taking depositions?

**MR. CLARK:**  Yes, next week, your Honor.

**THE COURT:**  And you're taking depositions?

**MR. CABELLO:**  Yes, your Honor.

**THE COURT:**  I want everyone to be flexible.  They should be flexible on time.

**MR. CABELLO:**  Your Honor, may I be heard on a couple of points?

**THE COURT:**  Yeah.

**MR. CABELLO:**  First of all, I was -- I did yield Mr. Spit's deposition, and I did yield Mr. de Coq's deposition.  So I was present, and yes, I was the one that asked the reporter how much time is left.

**THE COURT:**  Really?  Why did you do that?

**MR. CABELLO:**  I just needed to know, your Honor.  I had -- I wasn't feeling well, and I just -- I needed -- my back was in an extreme amount of pain and I just -- if anyone

wanted to conclude the deposition, it was me.  As it turns out, Mr. Clark ended the deposition with lots of time left.

THE COURT:  So in any event, I want you all to be flexible on this.  My inclination is to grant time liberally.

MR. CLARK:  Your Honor, my inclination is to agree to that, but the question is not seven hours.  I mean, that's the issue.  First of all, I don't think that Mr. Lake's deposition --

THE COURT:  You don't think we can do a compromise?

MR. CABELLO:  I believe so.

MR. CLARK:  I think we can, your Honor.

THE COURT:  Good.

MR. CLARK:  But I haven't heard anything from the other side --

THE COURT:  Well, you're going to, because when we get done with today, you know what happens next.  I've got a jury room, and you will be working out the hours issue.

MR. CLARK:  I'd like some guidance from you, with respect, because if -- one word --

THE COURT:  So here is my guidance.

MR. CLARK:  One word from you would resolve it.

THE COURT:  My guidance is, be liberal.  That's my guidance.  I don't know exact what the number of hours is, but I wrote down here, tell the parties that I'm liberal with hours.

**MR. CLARK:**  Your Honor, may I make a proposal, and we split the difference and --

**THE COURT:**  Make it to him, not to me.  I want you guys to get in practice, which you're not practicing enough, of compromising your discovery disputes.  I don't want you back here again.  There's all kinds of threats going on about further motions to compel, by both sides, all of which should be resolved between you.

**MR. CABELLO:**  Your Honor --

**THE COURT:**  If you continue to do this, I will make sure that I figure out who's at fault and sanction them. Don't -- let's not get there.  As you can tell, at various points in this discussion, I've been displeased with both sides.  So I'm not -- I don't have a favorite in this game, and you're both exposed if you continue in this fashion.

So as to docket 366, you can meet and confer now. As to -- and as to anything else that you're now fighting about, which you're planning on bringing a motion to compel, I want you to start those discussions right now, because you should be resolving these issues.

**MR. CABELLO:**  Your Honor, if I may, there was just one other matter that I wanted to point out to the Court, and that is that with respect to Mr. Spit and Mr. de Coq, there was only one notice of deposition, and that is a 30(b)(6).  We had designated those witnesses, and while we're going to work out a

time that is appropriate for Mr. Mitta and Mr. Lenz --

THE COURT:  Yeah.

MR. CABELLO:  -- we did notice them separately, both as a 30(b)(1), and then we had a 30(b)(6), Mr. Clark chose to designate Mr. Mitta and Mr. Lenz.  And so when Mr. Clark took the position of, well, gee whiz, you know, you're only entitled to seven, we said, well, we've done a 30(b)(1) notice and we have a 30(b)(6) notice.

THE COURT:  Can we please focus on what you actually need to get the information you want?

MR. CABELLO:  Yes, your Honor.

THE COURT:  What we should have done is we should have set some cap on the total number of hours early in this case, and that would get rid of all of these problems.

Okay, so is there anything else?

MR. CLARK:  Just a heads-up with regard to what's coming down the 'pike.  I don't want to -- I don't want to be too pessimistic -- pessimistic about the meet-and-confer.  If we have already met and conferred, because of instructions not to answer and because of --

THE COURT:  There's no instructions not to answer, by the way.  So for the rest of this case, I don't want a single instruction not to answer, except on privilege grounds, okay?  Privilege grounds, or outside the scope of a 30(b)(6).  I think that's fair ground, because you don't prepare a witness

for that.  Those are the two.  Harassing the witness, I guess that's a third.

Those are the three grounds on which you can do it. Other than that, a privilege or work product, harassing, outside the scope of 30(b)(6), otherwise no instructions not to answer whatsoever.  Nothing on confidentiality, nothing on relevance, no things like that.  Don't do it.  Okay?  That will take care of that problem.

**MR. CLARK:**  No, not, your Honor, because one of -- and I'm sorry, a little bit of history.  When I started off this deposition notice of designee, immediately Mr. Cabello instructed the witness not to answer on matters not part of -- not designated.

**MR. CABELLO:**  Your Honor, I withdrew those.

**THE COURT:**  And then he withdrew them.

**MR. CLARK:**  So I got the extract from Schwarzer's Federal Civil Procedure, had e-mailed that, showed it to Mr. Cabello (unintelligible) you're entitled to ask the witness whatever you like --

**THE COURT:**  Yeah.

**MR. CLARK:**  -- but he's not the corporate designee.

**THE COURT:**  Yeah, yeah, that's right.

**MR. CLARK:**  And Mr. Cabello didn't like Schwarzer's essay, he said he wanted the cases.  So I sent him the cases. Eventually, the deposition proceeded.  So I guess probably --

based on your instructions --

**THE COURT:**  No, no, I withdraw my instruction about beyond the scope.

**MR. CLARK:**  Okay.  Because then, your Honor --

**THE COURT:**  Okay.

**MR. CLARK:**  -- the rest falls in place, because there were three or four, maybe five instructions not to answer; for example, invalidity contentions, reliance on advice of counsel, and there were a few others.

**THE COURT:**  Well, reliance on --

**MR. CLARK:**  Those will require --

**THE COURT:**  Yeah?

**MR. CLARK:**  Those will require a witness to come from Europe.  So they're going to be hotly contested today, and if you could in two minutes make some rulings, you would save three hours of probably deadlock.

**THE COURT:**  Fine.  Make your argument.

**MR. CLARK:**  Your Honor, in each instance that there was an instruction not to answer, I believe the witness needs to be recalled, if the instruction was not for privilege, and I don't think any of the instructions were for privilege.

**THE COURT:**  So give me a specific.  I can only rule on specifics.

**MR. CLARK:**  Your Honor, that was a motion I was intending to file at the end of the month, but I know that on

the invalidity contentions, he was instructed not to answer. I know that on the advice -- reliance on advice of counsel, he was instructed not to answer. I think there were one or two others, but I can't immediately recall what they are.

There was also an issue with regard to the competence of the witness to testify. They produced the witness to testify on the chemical composition of the -- of this filler material, and he was not competent to testify. He couldn't tell me what the characteristics were, he didn't produce documents that indicated what the characteristics were, and he hadn't spoken to anybody, even though he had no personal knowledge, about the subject matter, and there are two or three subjects that fall into that category. And once again, it requires a witness to come from Europe, and I don't think we're going to get agreement, absent your involvement.

**MR. CABELLO:** Your Honor --

**THE COURT:** Yes, sir?

**MR. CABELLO:** May I respond?

**THE COURT:** Yes.

**MR. CABELLO:** What Mr. Clark wants this Court to do is to order an entity, an unnamed entity in this suit, by the name of Xycarb Ceramics, B.V., that is a Benelux corporation, to produce a witness about what's contained in this graphite. He wants -- he wants information with respect to B.V., and I did instruct the witness not to answer with respect to B.V.

He was there in his individual capacity and he was there as a corporate representative of Xycarb Ceramics, Incorporated.

Now, Mr. Clark kind of would like to muddle the issue, but Xycarb, B.V. is the manufacturer of this electrode. It is an independent, unaffiliated entity.  He has chosen to sue Xycarb Ceramics, Incorporated, and Xycarb Ceramics, Incorporated sells the electrode manufactured by this unaffiliated, independent entity called Xycarb Ceramics, B.V. That electrode is purchased, sold to the customer.

And so to the extent that he wants to get into details on how -- what this thing is composed of --

THE COURT:  Yeah?

MR. CABELLO:  -- the named entity doesn't have that information.  And he wants to kind of bridge the gap between the two -- he has recently filed a motion for leave to join B.V. as an entity, a tacit admission that B.V. is not an entity --

THE COURT:  It's not what?

MR. CABELLO:  And therefore, it's not under the court's --

THE COURT:  So this is the witness prep issue, right, you're talking about?

MR. CABELLO:  Well --

THE COURT:  You're talking about, you instructed him not to answer?

**MR. CABELLO:**  I instructed him not to answer on reliance, your Honor, and we can go through these one at a time, because there was --

**THE COURT:**  Well, that's what we're doing.

**MR. CABELLO:**  All right, so which one would you like to take up first, your Honor?

**THE COURT:**  So you've just discussed the issue about whether or not the witness was sufficiently prepared.  You've said --

**MR. CABELLO:**  As a 30(b)(6), for Xycarb Ceramics, Incorporated.

**THE COURT:**  -- as a 30(b)(6) for the defendant, because the defendant doesn't actually have personal knowledge, and no one at the company has personal knowledge, with respect to those topics.  That's your view of that.

**MR. CABELLO:**  On the construction of the --

**THE COURT:**  The construction, the materials, et cetera, that go into the chip, the device.

**MR. CABELLO:**  Those are not within the named defendant's power or control, and certainly knowledge.

**THE COURT:**  And with respect to -- did you instruct not to answer on those?

**MR. CABELLO:**  I can't recall, your Honor.  I'd have to look specifically at what's --

**THE COURT:**  I mean, it sounds like it was a witness

prep issue, but you shouldn't be instructing not to answer on that ground.

MR. CABELLO:  Without looking at the transcript and the specifics that Mr. Clark --

THE COURT:  And what about...  And so a little guidance:  You shouldn't be instructing not to answer on those grounds.

MR. CABELLO:  With respect to the privilege, I did instruct, and I do recall instructing the witness not to answer, for several reasons, your Honor.

First of all, there are opinion letters prepared by a Netherlands attorney, or a European attorney -- I don't know if it's Netherlands, but it is a European attorney -- and there is an opinion letter issued by an attorney here in the U.S., but I believe his name is Wegner, W-E-G-N-E-R -- there may be an extra E in there, I can't recall.  Mr. Wegner issued an opinion, not to the named defendant, but to B.V.

So -- and Ms. Merrill produced those opinions to Mr. Clark --

THE COURT:  Yeah.

MR. CABELLO:  -- with the specific agreement that we were not waiving the privilege on those agreements.  And so Mr. Clark accepted those opinions, with the understanding that the privilege was not being waived.

Ms. Clark, as I understand -- I'm sorry --

Ms. Merrill, as I understand it, did so just because she just wanted to put an end to some bickering that was going on about the opinions, and so she said, look, I'll produce them with the understanding that we're not waiving the privilege.

THE COURT:  And...

MR. CABELLO:  I had gotten into that -- into that matter, your Honor, and I --

THE COURT:  Have you asserted advice of counsel defense?

MR. CABELLO:  We don't know when the deadline is, your Honor, but I am not going to assert advice of counsel.

THE COURT:  Okay.

MR. CABELLO:  We're not relying on the opinions, and so given that we don't believe we've waived the privilege and given that we're not relying on them, and I told Mr. Clark then, I didn't think we were going to rely on them because they were opinions rendered to B.V., not to Inc.

THE COURT:  Okay.  What about -- there was another --

MR. CLARK:  It was the invalidity contentions.

THE COURT:  Invalidity contentions.

MR. CLARK:  There's an admission in the invalidity contentions that certain claims have certain characteristics.

THE COURT:  No, I know, regarding the --

MR. CABELLO:  I don't recall the testimony, your

Honor.  For the life of me, I don't, and --

**THE COURT:**  Okay, no instructions not --

**MR. CABELLO:**  -- I'm not being cute with the Court.

**THE COURT:**  Just -- so here, here.  Let me get Mr. Clark to respond on the advice of counsel issue.

**MR. CLARK:**  Your Honor, they've been on the fence about whether they're going to rely on it or not.  Now they've affirmatively told you they don't rely on it.  That issue's gone.

**THE COURT:**  Good.

**MR. CLARK:**  As far as the invalidity contentions --

**THE COURT:**  So invalidity contentions, he's not sure whether -- so let me just -- on these two preps, the two issues, whether or not the 30(b)(6) witness was properly prepared, and on invalidity contentions, you should not be instructing not to answer on those, and so when you go into your meet-and-confer on whether or not you're going to re-produce witnesses if he shows you that you instructed not to answer on those bases, bear that in mind, because that's my view, that you don't instruct not to answer on those bases.

I did want to ask you about this issue about B.V. He says they don't have knowledge.

**MR. CLARK:**  Yeah, your Honor, if -- if the question was put, and they said -- just said they didn't have knowledge, that would be another matter --

THE COURT:  Right.

MR. CLARK:  -- but they never -- the question was not put.

THE COURT:  Okay, well, it may be that when you get an answer to that question, it's "I don't know," and so there may be an easier way to get the "I don't know," if the company doesn't have knowledge of that information, rather than having a witness come.

MR. CLARK:  But your Honor, you know, this whole thing about the company overseas is problematic, because of course, except for a few sales staff, the local company has nobody.  It really is a sales department of a European company. Its chairman is the CEO of the Dutch company.  So there's absolutely -- there's control.  Local guy reports directly to the CEO of Xycarb, B.V. --

THE COURT:  Yeah.

MR. CLARK:  -- who has the control.  He admitted at his deposition that if he had asked the guy who has the formula, he would have got it.  So that it's absolutely under his control.

Now, what's happening is we're getting sandbagged here, because every time there's a document from Xycarb --

THE COURT:  So why aren't you taking the deposition of the European entity?

MR. CLARK:  Because there's no ability to take a

deposition of the European -- they're not subject to the subpoena power of the court.

THE COURT:  Well, there are other ways to get the depositions of European entities other than issuing a subpoena power of the court.

MR. CLARK:  Well, one can do a commission, but since they designated the very people who I wanted to depose and present them here as the designees of the local company -- they didn't appear as designees of B.V.

THE COURT:  Yeah, if those people who showed up have knowledge of these things, they have to testify to them, regardless of who they work for and how they got the knowledge.

MR. CABELLO:  And your Honor --

MR. CLARK:  And they didn't.

MR. CABELLO:  -- as I understand it, Mr. de Coq has -- doesn't have knowledge of that, and he certainly wasn't prepped on it, and Mr. Spit, who is the CEO --

THE COURT:  Right, he doesn't have to be prepped on it, because if it's -- well, I don't know whether you're going to... So I --

MR. CLARK:  Well, they're two different.  We have the characteristics of the glue are the one thing, and I don't think he instructed on that issue.  I think the witnesses --

THE COURT:  So why are you trying to hide the knowledge of B.V.?

**MR. CABELLO:**  Your Honor, we're not trying to hide it.  What we want --

**THE COURT:**  Then disclose it.

**MR. CABELLO:**  Well, what we want is for -- is to at least recognize that these are different entities --

**THE COURT:**  Okay, I recognize it.  Now what?

**MR. CABELLO:**  -- and you are actually right. Mr. Clark could depose B.V. --

**THE COURT:**  Why don't you get --

**MR. CABELLO:**  -- but what he did is, he did not plan for it, and so --

**THE COURT:**  Fine.  Can we skip over that step and just get it done?

**MR. CABELLO:**  Your Honor, I don't understand -- I mean, this is really a witch hunt, at the end of the day, because --

**THE COURT:**  I know you think it's a witch hunt, but there's a lawsuit and we have to do discovery in it, and it may be that at the end of the day, Judge Chen will, after he dismisses the case, sanction these people by having them pay all your attorneys' fees.  We'll get to that when we get to that, but the composition of the --

**MR. CLARK:**  Adhesive.

**THE COURT:**  -- adhesive and the composition of the device is the issue --

**MR. CABELLO:**  And your Honor, if Mr. Clark -- I don't have authority, but I will offer that if Mr. Clark wants to go to the Netherlands and depose a B.V. witness there, I will make that B.V. witness that has that knowledge available.  I'm not going to --

**THE COURT:**  You'll do that, right?

**MR. CLARK:**  I'll do that, your Honor.

**THE COURT:**  There you go.

**MR. CLARK:**  Okay.

**THE COURT:**  See?  That's a solution to that problem.  Okay?  So we've solved -- so you're going to meet and confer on the instructions not to answer, because other than on advice of counsel, which has been mooted --

**MR. CLARK:**  Your Honor, obviously --

**THE COURT:**  -- as to the --

**MR. CLARK:**  Sorry.

**THE COURT:**  -- a person from Xycarb, B.V. with knowledge of the composition of the device, defendant has offered to make a person available in the Netherlands, and plaintiff has agreed.  So that's ordered.

**MR. CLARK:**  Your Honor, we'll need to extend the discovery cutoff to accommodate that, please.

**THE COURT:**  I can't do that, and I have no intention of doing that.

**MR. CLARK:**  It's impossible to do it in the next two

weeks.

THE COURT:  Well, it's not me.  It's not my job -- it's above my pay grade.  It's Judge Chen's case.

MR. CLARK:  Okay, I'll go to Judge Chen.

THE COURT:  And I don't know what Judge Chen will say and I don't know where you'd stipulate, but you have to -- just take that deposition.

MR. CLARK:  Okay.

MR. CABELLO:  Your Honor, there have been some instructions not to answer by Mr. Clark of Mr. Lenz.

THE COURT:  Okay, you shouldn't be instructing not to answer except on the narrow grounds I said.

MR. CLARK:  I don't think I did.

THE COURT:  Well, then, you show him the things and if he's done it wrong, then he's going to have to make up for that.

MR. CLARK:  Okay.  I certainly objected to certain testimony, but I let him answer.

THE COURT:  You can object.  Just can't instruct not to answer --

MR. CLARK:  Yeah, I don't believe I ever instructed --

THE COURT:  -- except on privilege or harassment.

MR. CABELLO:  I will be happy to show you that.

THE COURT:  No instructions not to answer except on

privilege or harassment.

MR. CLARK: Well, your Honor, I can tell you right now that if I did instruct not to answer, I will recall the witness. I'm absolutely certain I did not ever instruct the witness not to answer.

THE COURT: Okay, good. That will take care of that problem, one way or another. You did or you didn't.

Anything else?

MR. CLARK: I believe that's it from our side, your Honor.

MR. CABELLO: Your Honor, may I have just one minute?

THE COURT: Yeah.

MR. CABELLO: Thank you.

MR. CLARK: I should say, your Honor, for today --

THE COURT: Oh, ho, ho. Of course, for today.

MR. CLARK: Because there, I know that there are other festering issues out there.

THE COURT: Oh, but solve them.

MR. CLARK: I hope today --

THE COURT: I don't want you to have to go through this ordeal again.

MR. CLARK: Your Honor, and I appreciate your comments, because I think they're going to be very helpful in solving --

THE COURT:  Good, good.

MR. CLARK:  -- our disputes.

MR. CABELLO:  Your Honor, I believe the other issue, or -- the other issues I'm going to be able to work out, I had asked Mr. Clark for the inventor's lab notebooks.

THE COURT:  Oh, you'll work that out.

MR. CABELLO:  He produced Mr. Lenz's lab notebook during his deposition, and I hope to see Mr. Degner's before his deposition.

THE COURT:  Fabulous.

MR. CABELLO:  Thank you.

THE COURT:  Okay, so we're going to be in recess, but go in and work out the couple of issues that I charged you with working out, including the timing, the number of hours, in our jury room, please, and when you're done, so that we don't have a thing like last time, write it down and sign it, and give it to Karen.  We're going to have it filed as a stipulation of the parties.  Okay?

MR. CABELLO:  Very well, your Honor.

THE COURT:  Great.  We'll be in recess.

MR. CLARK:  Thank you for the time, your Honor.  We appreciate it.

MR. CABELLO:  Thank you, your Honor.

THE COURT:  We're done.

                         ---o0o---

(Whereupon the proceedings were adjourned at 11:23 a.m. and resumed at 2:04 p.m., as set forth below.)

---oOo---

**THE CLERK:** We're recalling case number C 03-1335, Lam Research Corporation versus Schunk Semiconductor.

**MR. CLARK:** Good afternoon, your Honor. Stuart Clark appearing for Lam Research Corporation.

**MR. CABELLO:** And David Cabello appearing for Xycarb Ceramics, Incorporated.

**THE COURT:** Welcome back. So I've been presented with a stipulation. Let me just quickly review it.

And the last entry is, resolution of RFPs 43 and 50 and production of design lab -- designer --

**MR. CLARK:** Degner.

**MR. CABELLO:** Degner.

**THE COURT:** -- Degner -- Degner lab notebooks, to be submitted to Judge Spero.

Okay, so there's one thing left, so that I'll order this stipulation filed, and then -- what is that last little tidbit you left for me?

**MR. CABELLO:** Well, the Degner lab notebook. Degner is one of the named inventors, your Honor.

**THE COURT:** Uh-huh, and so what's the issue on that?

**MR. CLARK:** Your Honor, I've spoken to Mr. Degner, and I expect to represent him at his deposition.

THE COURT:  Yes.

MR. CLARK:  But I don't think I can -- he's not a party, of course, to the case.  I don't think I can bind him to any discovery ruling.  I heard your admonishment about the need for this book to be produced.  I have produced the Lenz inventor's notebook.  If Mr. Degner has an inventor's notebook, I intend to recommend to him that he should produce it, but I don't think I can, on his behalf, undertake to do so.

THE COURT:  Well, why don't we do it this way.  You represent Mr. Degner, right?

MR. CLARK:  I believe I will be representing him, your Honor.

THE COURT:  You believe you will be, but you don't represent him now.

MR. CLARK:  Well, I arranged with him -- I did negotiate the date with him, so I'm probably technically his attorney at the moment, but I have no engagement letter with him at this time.

THE COURT:  Okay.  Well, I'm going to order that he produce the -- his lab notebook for the invention.

MR. CLARK:  Very well, your Honor.

THE COURT:  Okay?  And we'll add that to the order for today.

Is that the -- what is this, 43 and 50?  Is that the --

**MR. CABELLO:** There's two requests for production, your Honor, that Mr. Clark and I could not resolve.

**THE COURT:** Okay. Have I heard about them before?

**MR. CABELLO:** They were listed in paragraph J, your Honor.

**THE COURT:** Of the additional items.

**MR. CABELLO:** Yes, the additional items that -- the hodgepodge category.

**THE COURT:** What are those?

**MR. CABELLO:** Forty-three, if I may read it, your Honor,

        "All documents relating to the financial value of
        the '266 reissue patent, including calculations,
        valuation or estimates of its worth as an
        intellectual property asset."

And what I did -- and I'm happy to hand up my --

**THE COURT:** I think I've got the sense of what you're asking for.

**MR. CABELLO:** And what I suggested to Mr. Clark is that we look at the change in value, if any, that was assigned to the '266 patent when the transition occurred --

**THE COURT:** Say that again, please.

**MR. CABELLO:** The change in value --

**THE COURT:** Yeah.

**MR. CABELLO:** -- if any, when the transition

occurred between the time that they were actively selling the indium-bonded electrode to the time that they were selling the elastomeric-bonded electrode.

THE COURT:  Why do I care about this issue?

MR. CABELLO:  Well, again, it goes to whether or not Lam believed that the '266 patent covered the elastomeric-bonded electrode.  If that value dropped in their books, then I believe it's an indication that they didn't believe that --

THE COURT:  It could be an indication of a thousand things.

MR. CABELLO:  Well, it's possible, your Honor, but certainly, to the extent that there's a change in value, there should be at least --

THE COURT:  Okay, and why don't you want to produce that, Mr. Clark?

MR. CLARK:  Your Honor, we assert no claim with respect to the diminution in value of the patent.  It's just not an issue in the case, and I don't know if these documents exist, but it's just completely irrelevant to this case.

THE COURT:  Okay, what's the other number, 50?

MR. CABELLO:  The other one is 50, your Honor, and if I may, I'll read it or I'll pass it up.  How would you want --

THE COURT:  Yeah, you can read it.

**MR. CABELLO:** All right. Request number 50,

"Documents sufficient to identify your personnel,

employees, officers and directors who have been

involved at any time with establishing your policy

or strategy for enforcing your patent rights."

**THE COURT:** And the reason that's relevant?

**MR. CABELLO:** Again, this goes to the tying issue,

your Honor. If there's any suggestion that we're going to

enforce our patent rights so that we can make sure that we can

continue to offer our unpatented products with our patented

products, or to the extent that we get competition --

**THE COURT:** I guess I should -- better look at that

paragraph --

**MR. CABELLO:** Let me pass it up, your Honor.

**THE COURT:** -- again, I'm not following it.

**MR. CABELLO:** I'm sorry, I don't have a page --

I mean, a copy for you, your Honor. It's at the bottom of that

page.

**THE COURT:** That's fine. So this is number --

**MR. CABELLO:** Fifty.

**THE COURT:** -- 50, personnel who have been involved

in establishing... Okay, so now I understand what it seeks.

Tell me again your argument on why it's relevant to this case.

**MR. CABELLO:** Well, the argument, your Honor, is

that there is a tie of unpatented products to the patented

article.

THE COURT:  Yeah.

MR. CABELLO:  And so to the extent that there has been a strategy involved in exploiting a patent on a patented article to promote unpatented products, I think that goes to the strategy of licensing, and -- I'm sorry -- to the strategy of certain of their patents.

THE COURT:  And what issue in this case is that relevant to?

MR. CABELLO:  Well, the issue ties to patent misuse, your Honor, when you force a customer to buy --

THE COURT:  And have you raised the affirmative defense of that misuse?

MR. CABELLO:  Your Honor, there is an unclean hands defense, which we believe falls within the rubric of --

THE COURT:  Close enough.

MR. CABELLO:  Okay.

THE COURT:  And this just seeks the identity of people.  And your reason for not identifying the people?

MR. CLARK:  Your Honor, first of all, the question goes beyond this case.  It's for enforcing patent rights in all cases.

Secondly, you have previously ordered that we were not required to produce documents that led to the decision to file this case.  You told me that all I had to do was to put

that in a privilege log.

I think this falls into the same category.  It's more of the same.  It's --

THE COURT:  Yeah, but that's --

MR. CLARK:  -- motivation for filing the lawsuit.

THE COURT:  Well, no, no, but he's not talking about the lawsuit.  So it is a little broad, because what you're really talking about, people involved in establishing the policy of tying patented and unpatented projects sales together, bundling, that sort of thing, that's what you're really after.

MR. CABELLO:  Yes, your Honor.

THE COURT:  Not the general stuff about, you know, how we enforce our IP.  So is there a sub- -- I mean, maybe there's some subcategory about, identify the people who are involved in the -- setting any policy regarding a bundling of patented and unpatented products, something like that?  Is that what you're looking for?

MR. CABELLO:  Yes, your Honor.

THE COURT:  Is there any --

MR. CLARK:  Well, your Honor, you've ordered us to produce everything about bundling.  So if we attempted to bundle -- I mean, first of all, we disagree that the elastomeric patent is not covered by the '456 patent, but putting that aside, you really ordered us --

THE COURT:  Well, so we shouldn't put it that way, then, right?  We should put it, a bundling of products.

MR. CLARK:  But you've already ordered us to produce everything about bundling.  So that would necessarily encompass what you've just (unintelligible) it, your Honor.

THE COURT:  Well, it might not identify the people who were involved establishing any policy or strategy for...

MR. CLARK:  I have no knowledge of any such patent strategy at all, your Honor, but --

THE COURT:  Well, any strategy --

MR. CABELLO:  It's a business strategy.

THE COURT:  -- or policy regarding bundling of multiple products.

MR. CLARK:  Of indium and elastomeric products.

THE COURT:  Those are the two, right?

MR. CABELLO:  Yes, your Honor.

THE COURT:  Indium --

MR. CABELLO:  And elastomeric electrodes.

THE COURT:  -- -bonded and elastomeric-bonded --

MR. CABELLO:  Electrodes.

THE COURT:  -- electrodes.

MR. CABELLO:  Right.

THE COURT:  Okay, so identify persons involved in any strategy or policy regarding the bundling of elastomeric and indium-bonded electrodes.

Okay, and I'll repeat, 43 is denied.  So that should solve....

Here, you can give this back to counsel, Karen.

So to review, you're going to produce the Degner lab notebook, RFP 43 is denied, RFP 50 is granted in that limited respect.  Okay?

**MR. CABELLO:**  Very well, your Honor.

**THE COURT:**  Thanks, team.

**MR. CABELLO:**  Thank you.

**MR. CLARK:**  Thank you, your Honor.

**MR. CABELLO:**  May we be excused, your Honor?

**MR. CLARK:**  Thank you for your time.

**THE COURT:**  Been a pleasure.

**MR. CABELLO:**  Thank you very much, your Honor.

**THE COURT:**  File that, please.

**MR. CABELLO:**  Your Honor, excuse me, I meant to raise, will there be an order from the Court on all this?

**THE COURT:**  Oh, yeah.

**MR. CABELLO:**  Thank you very much.

                                                    2:14 p.m.

                          ---o0o---

**CERTIFICATE OF TRANSCRIBER**

I, Leo Mankiewicz, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.

_____  08/24/2014

Signature of Transcriber          Date