Pages 1 – 60

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

LAM RESEARCH CORPORATION,           )
                                    )
            Plaintiff,              )
                                    )
   VS.                              ) NO. C 03-01335 EMC
                                    )
SCHUNK SEMICONDUCTOR, et al.,       )
                                    )  San Francisco, California
            Defendants.             )  Thursday
                                    )  September 4, 2014
_____)  2:14 p.m.

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:          CARR & FERRELL, LLP
                        120 Constitution Drive
                        Menlo Park, California   94025
                   BY:  STUART C. CLARK, ESQ.




For Defendant Xycarb Ceramics, Incorporated:
                        WONG, CABELLO, LUTSCH,
                           RUTHERFORD & BRUCCULERI, LLP
                        20333 SH 249
                        Suite 600
                        Houston, Texas   77070
                   BY:  J. DAVID CABELLO, ESQ.




Reported by:            BELLE BALL, CSR #8785, RDR, CRR
                        Official Reporter, U.S. District Court

**THURSDAY, SEPTEMBER 4, 2014**                    **2:14 P.M.**

**P R O C E E D I N G S**

**THE CLERK:**  Calling Case C-03-1335, Lam search versus Schunk Semiconductor.

Counsel, please come to the podium and state your name for the Record.

**MR. CLARK:**  Good afternoon, Your Honor.  Stuart Clark appearing for Plaintiff Lam Research Corporation.

**THE COURT:**  All right.  Thank you, Mr. Clark.

**MR. CABELLO:**  Good afternoon, Your Honor.  David Cabello with Wong, Cabello, appearing for Xycarb Ceramics, Incorporated.

**THE COURT:**  All right.  Good afternoon, Mr. Cabello.

**MR. CABELLO:**  Good afternoon, Judge.

**THE COURT:**  Let's first address Lam's motion to file a second amended complaint to add Xycarb BV.

This is something -- Xycarb BV's involvement has been evident for some time.  Certainly, by the middle of 2003, it seems to me.

There were declarations filed by Mr. van den Cruijsem -- I'm not sure if I'm pronouncing it correctly -- and by Jacques Paulus.

There's a deposition taken where Xycarb -- the relation about between Xycarb Ceramics and Xycarb Ceramics BV was evident in terms of buy-sell distribution.  So, not a surprise

entity in this thing.

So, why weren't they brought in earlier, before all the deadlines and everything?

**MR. CLARK:**  Your Honor, it was known from back then that Xycarb BV was the supplier of the electrode, the accused product.  But nothing was known about the extent to which they were actually involved in promoting the sales of those electrodes.

In the early -- at the time of the TRO back in 2003 --

**THE COURT:**  Well, this deposition of Mr. van den Cruijsem says (As read):

"And they sell electrodes for Xycarb BV, correct?"

"That is correct."

"So one function of Xycarb Ceramics Inc. is sell and distribute electrodes Xycarb Ceramics BV, correct?"

"That is correct."

**MR. CLARK:**  There is no doubt that the U.S. company was selling the products of the Netherlands company.

But the question is:  Was there any evidence that -- of the involvement of the Netherlands company in the actual promotion of those sales, the inducement of the sales?

And that was the evidence that we didn't have, we didn't have at that time.  There was no discovery into what the involvement of the Netherlands company was in promoting the sales in the United States.

Certainly, they made the property available in the United States. And that was known from the outset. And they certainly were involved in the TRO proceedings because they were involved in the --

(Reporter interruption)

**MR. CLARK:** And they certainly provided supporting evidence, when Xycarb US had to defend against the temporary retraining order motion.

But, there was nothing in those proceedings that in any way indicated the extent to which the Netherlands company was actually involved in promoting the sales.

And it was not until we took the deposition in July of this year of the 30(b)(6) representatives of -- of the -- of, technically, Xycarb, Inc., although they were both -- both representatives were Xycarb BV employees, including its CEO. At that stage, we discovered that the CEO made regular visits to the United States, to trade shows, to individual customers.

In fact, even before that, Your Honor, I must -- there was one other deposition at which we learned a little bit about the activities of BV, and that was the Ryan deposition which was taken, I think, at the end of June.

And, that was the first indication we got -- we found emails that were presented for the first time just before the Ryan deposition that indicated that people from the Netherlands company were regularly visiting the United States

and assisting.  Dealing with technical issues with customers, dealing with sales queries from customers, dealing with shipments to customers.  And, none of that was -- came out in the TRO proceedings.

Now, there was a -- we issued this, this 30(b)(6) notice in -- shortly after your claim construction order in April. And it took three months before Xycarb would present witnesses for testimony.  There was an undue delay there.  They said that witnesses were not available, they were in China, et cetera, et cetera.

So, we didn't get any information about the extent of the Netherlands company's involvement in promoting the sales and assisting, assisting the sales in the United States until June, and then July.

And then within two weeks after we got the 30(b)(6) deposition taken in July, I filed this motion to amend.

And it's not only the question, Your Honor, of the promotion by the Netherlands company of sales in the U.S. It's actually, we needed to know about activities in the U.S. that would provide personal jurisdiction of the Netherlands company.

So, I think to -- there is no way that we could safely, given the Rule 11 constraints, have sought to join the Netherlands company prior to the time that we did.

THE COURT:  Let me ask you, if the amendment were

allowed, in terms of the prejudice factor, which is, of course, very important under Rule 15, are you conceding that Lam will not need any discovery, further discovery on this question?

Do you have what you need?

**MR. CLARK:**  We do, Your Honor.

**THE COURT:**  All right.

**MR. CABELLO:**  Your Honor, may I be heard?

**THE COURT:**  Yeah.

**MR. CABELLO:**  All right.  First of all, there is a high degree of prejudice to my client, Xycarb Ceramics, Incorporated.  This case has been pending over eleven years. They've had this hold over them for over that period.

And we are on the eve of trial, six months from now, and Mr. Clark wants to add an unaffiliated independent company in the Netherlands.

Now, that unaffiliated company -- first of all, I don't have authority to accept process for them.  So, Mr. Clark is going to have going to through the Hague Convention, and serve the Netherlands company through the Hague Convention.

There'll undoubtedly be a jurisdictional battle.  I don't represent Xycarb Ceramics BV, but I suspect there will be a jurisdictional battle.

And then on top of that, Xycarb BV is going to be entitled to assert its own defenses.

Just last month, in Judge Spero's courtroom, Judge Spero asked me if Xycarb Ceramics, Incorporated was going to be relying on the advice of counsel in defending against willfulness.

During that hearing, I announced in open court that those opinions that Mr. Clark has been trying to depose my clients about were opinions rendered to BV, not Inc.  And therefore, Inc. had no desire to rely on those opinions.

But clearly, BV I suspect will want to rely on the opinions of counsel.  They will want to assert their own defenses.  They will want to assert -- whatever it is.

I mean, I'm just thinking, first of all, there are international acts of unfair competition that I'm aware of. And they, BV, may want to go ahead and bring those into this courtroom if there is jurisdiction, and assert those as counterclaims, which may subject this Court to interpreting those acts committed by Lam outside the United States pursuant to some of the antitrust laws here in the United States, and will require the interpretation of law outside the United States.

Moreover, Lam approached BV in the Netherlands in late 2002.  There is correspondence between Lam and BV.  There were visits by Lam in the Netherlands.  They looked at the electrode; they understood the electrode.  It's the same electrode that Inc. is selling for BV.

And, they had all that time.  They understood the interconnection between BV and Inc.  For whatever strategic reasons, they've delayed joining BV, and now they choose to join BV.

I don't know what is driving this, but I think it's way too late, Your Honor.

Mr. Clark confuses the evidence required to prove inducement, and the evidence required to plead inducement. He's had all the facts before him to plead inducement of infringement since 2003, during the temporary injunction discovery phase.  That's all he needed to plead inducement of infringement.

And so, Your Honor, I think my client, that is Xycarb Ceramics, Inc., the party before this Court, would be severely prejudiced by continuing this litigation for years to come.

Mr. Clark, in his pleadings, admits that if this Court were not to allow BV to come in, he would have a separate cause of action.  And he may well assert that cause of action wherever it's appropriate.

So, we would invite Mr. Clark to sue BV or whomever else he chooses, but we don't want to drag down this litigation when we're this close to trial, and thereby jeopardize my client.

**THE COURT:**  And what about the process question? Hague Convention, effectuating process?

We've got -- well, non-expert discovery cutoff having already transpired, expert discovery cutoff having -- coming up within some 34 days, 35 days.

It seems to me, unless they accept service of process, which you're hearing they won't, I'm not even sure how you can effect service of process and then give them a chance to respond.

How can this possibly get done within this time frame?

**MR. CLARK:**  Your Honor, that's a problem.  But, the notion of this is an independent and unaffiliated company is absurd.

**THE COURT:**  Well, let's say they're not independent.

But how -- now that we are here at this late date, how can we keep the trial date, the discovery cutoff date, the dispositive motion date and all that needs to happen in order to get this case to trial, and this is now an 11 -- it will be a 12-year-old case by the time we get to trial.

How are we going to keep this on track by bringing in a European country for whom service -- if it is correct that the Hague Convention processes will have to be employed, my experience is that takes months and months, unfortunately.

**MR. CLARK:**  Your Honor, if the Hague Convention process has to be followed, and it does take that period of time, which is my understanding too, that -- that won't prejudice the named defendant.  There's no reason why this

trial shouldn't go ahead.

I should just say, as an aside, this case has been pending for eleven years. But six of those years it was pending, it was suspended because -- because of a reexamination application by the Defendant. And subsequently, for almost three years, the case was -- was put on hold because of a further examination request.

So, and the interesting thing is just recently, you denied a motion for bifurcation in which Mr. Cabello was quite happy to have this trial split in two. And he wasn't at all anxious that the case should be disposed of in March.

Now he comes to tell you that it's absolutely essential that the case be disposed of in March. So Xycarb is, in a sense, talking out of both sides of its mouth.

**THE COURT:** Well, I'll put into that. Whatever your views are, and whether they change or not, it's the Court's view that this case is going to be tried in March.

If you look at my schedule, I have no other way. If I don't get this case out when I have this scheduled, it ain't getting out until late next year. And that's not happening. This case is going to trial. So, that's a given.

So the only question is, and on both motions, whether I can possibly grant any amendment to any answer or any complaint without upsetting that trial date. And it's evident to me now that -- I don't see how I can add BV.

If you want to file a new complaint against them, relate it, move to consolidate, or see if they can get on track quickly so that maybe there's a way to consolidate them for trial purposes, if you can jet this thing through, you know, that's something to consider.

But to add it into this case, and then have to go through a bifurcation motion or severance, or something else, that doesn't make any sense.

**MR. CLARK:**  Well, that's what I was going to say, Your Honor, is if it turns out that adding another defendant does put the trial date -- threaten to put the trial date in jeopardy, then the answer is to bifurcate.

So, you'll be in exactly the same position as if a separate action was filed.  But --

**THE COURT:**  Be in exactly the same position if a separate action were filed, and I decided to consolidate.

**MR. CLARK:**  Yes.  So, Your Honor, why not -- we've got six months before trial, seven months before trial.  If the Defendant is added, and it turns out that it's going to burden this case and we're going lose our trial date, then, sever or bifurcate.  But don't force the consequences of two separate trials on the parties.

Mr. Cabello says that his client wants to be free of this case.  Don't forget the people who he's getting instructions from are both officers of BV.  The CEO and the business

manager.  They're -- the only people who have ever appeared in this courtroom or been participants in this case is BV people. So, the shell game goes on.

Now, I accept that he may refuse or that BV may refuse to accept service, because they've obstructed everything in this case.  And I expect them to obstruct that, as well.  Even though the person he will talk to about today's meeting is a person from BV.  So, you know, I guess that's his choice in litigation.

But, what I'm urging Your Honor is if you should get behind the shell game, name BV.  If it turns out that affects the trial date, sever BV or bifurcate.  But, these issues are absolutely the same issues.  They should not be tried twice. And, and I would urge you to let us join them.

**THE COURT:**  Well, yeah; had you brought this motion six, eight, ten months earlier, it would be an easier sell.

But, at this point -- you know, if it was plausible that this case could be -- this other defendant could be brought in and the issues resolved and the defenses resolved and the pleadings resolved, and discovery for their own issues completed in time, if it was plausible, then it may make sense to let's spin the dice, let's throw the dice, let's try to keep it consolidated as long as we can, and then we'll see where we're at.

But, it's not even plausible.  We're past the cutoff date;

it's too late for discovery; the expert reports were due on the 28th, and the rebuttal report.  I can't see how you could possibly bring in a new defendant, even if you could serve them tomorrow -- you know, there may be a lot of overlap.

There may be a lot of issues, that -- the core issues of infringement or not, in the first instance, obviously is a predicate to any inducement claim.  But the inducement, itself, is going to be separate issues, as you have alleged in here.

I mean, there's all sorts of questions about BV's involvement, how much marketing did they do, what encouragement, what role did they play, et cetera, et cetera, et cetera.  Those are other issues.

**MR. CLARK:**  I agree, Your Honor.  If I could just talk about plausibility?

When you look at it, the conduct that leads to inducement is all the conduct at BV.  So, it knows that conduct.  Now, I'm not suggesting that there shouldn't be any discovery for BV, obviously.

But, it seems to me that since there's no information that Lam has about inducement that didn't come from BV, itself, perhaps some interrogatories and document requests would be all of the discovery that BV would require.

I mean, BV would not take its own depositions.  And nobody at Lam has any information about what BV did.  So, what BV did

is enshrined already in the depositions that have been taken. So, there's really no need for additional discovery.

Certainly, no experts would be involved in proving inducement. So --

THE COURT: No, I don't know that.

MR. CLARK: You may have to -- you may have to open discovery for BV, for limited purposes. But the discovery that is -- will be involved in a trial involving two Xycarb defendants has been done, pretty much.

MR. CABELLO: Your Honor, may I be heard?

THE COURT: Yeah.

MR. CABELLO: Your Honor, as I've stated to the Court, I do not represent BV.

However, if I were called as new counsel to represent BV, I would want my own ability to challenge the validity of the patent. I would want to assert my own defenses with respect to non-infringement. I would want to assert my own claim terms for construction.

I mean, we're talking about a brand-new lawsuit, because these are independent companies. I'm not even going to dignify Mr. Clark's comments about a shell game. These are two companies that are operated separately. He's trying to pierce a corporate veil, without any proof at all.

And so, BV is entitled to its own defenses. That means its own non-infringement defense, its own invalidity defense;

it's entitled to its own claim construction hearing.  There are a lot of issues here.

And so, Mr. Clark is putting the cart before the horse, saying, "Oh, just a couple of interrogatories."  That discovery process is going to be a sideshow of its own.

And so, while I don't represent BV, I can look far enough down the road to understand that bringing in a new party is going to bring in a host of new issues.

**MR. CLARK:**  May I just respond to that, Your Honor?

**THE COURT:**  Yeah.

**MR. CLARK:**  We've gone on a bit.

It's just fanciful to think that the BV person who is instructing Mr. Cabello in his capacity as counsel for the U.S. company is going to take a different approach to claim construction, to all the matters that he just raised, than the very same person is going to be taken in his capacity as -- as instructing Mr. Cabello as counsel for BV.

It's absurd to suggest that there will be any difference, when BV has controlled this case from the beginning.  All those depositions in 2003 were BV representatives.

This case has been conducted by BV.  There's not any -- any distinctive litigation strategy that's likely to occur between the two of them.

**THE COURT:**  All right.

I'm going to deny the motion to amend the complaint.  It's

a function of, number one, time.

I do believe that -- the information that at least inquiry notice was available much earlier to extract and to discern some of the information that is now alleged in the proposed second amended complaint, BV's presence, role, manufacture of the electrodes, and the fact that they submitted declarations in opposition to the motion for temporary restraining order, earlier on, I think I gave fair notice that they may have had some involvement that was worthy of discovery.

In any event, here we are, literally on the eve of trial, past the date of discovery cutoff, coming up on other dates that I'm not willing to move. For instance, summary judgment, dispositive motion hearing, if there's going to be one here. I'm not going to move that now. I'm not going to move the trial date or the pretrial date.

And, so -- there's just not enough time, given that this is a defendant that's out of the country. And even if they're related, even if they overlap, even if they're part of -- Mr. Stuart calls it a shell game. That's -- that doesn't mean that this can be accelerated so quickly that it's not going affect the trial date, which is my main concern here.

If that leaves Lam free to bring a separate action, move to relate that case here which should be related, if they can get it served quickly somehow and get it accelerated to a point where it actually could be ready for trial around the

same time frame, I would consider possible consolidation at that point.  Because it does make some sense.  But, I find that very, very unlikely.

And, for that reason, because of the prejudice and disruption of the trial schedule, and I think the near impossibility of getting that case ready against BV, Xycarb BV, I'm going to deny the motion.

MR. CLARK:  As the Court pleases.

THE COURT:  All right.  So then we have the motion to amend the answer.

MR. CABELLO:  Yes, Your Honor.

THE COURT:  And now, I understand here, you've got an argument that this document that was not revealed, the basis of your -- the SMI structure, the SMI publication was not disclosed until recently.

Right?

MR. CABELLO:  That's correct, Your Honor.  It was -- I understand that it was in Lam's prosecution files.  And that it was not -- and it certainly wasn't disclosed until around the 10th of July, if I'm not mistaken, Your Honor.

This is a document -- we had asked for the conception documents, and the reduction-to-practice documents over three years ago.  And the local patent rules require production of those documents over four years ago.  There clearly is an argument about the applicability of the SMI document.

I've asked Dr. Lin to join me this afternoon, to the extent the Court wants to hear any testimony about the applicability of the SMI reference.  I'm prepared to put on Dr. Lin as a witness so that the Court can determine for itself the applicability of that reference, vis-à-vis the claims and vis-à-vis the invention that is claimed in the '266 patent.

As it turns out, Your Honor, there are I think two fundamental issues related to this particular reference.  One is:  Is the sputtering target an electrode?  And, Mr. Clark says it's not an electrode.

And I believe that if the Court were to entertain testimony from Dr. Lin, we would compare both a sputtering machine and an etcher, a plasma etcher, and the Court could see that the sputtering target is indeed an electrode.

It is even referred to by Lam in a separate patent as an electrode.  And it's even referred to in the invention disclosure, which Mr. Degner and Mr. Lenz filled out back in the 1990 time frame before the patent application was filed.

There are specific references to "sputtering targets." There are specific references to what is called "a support frame."  And, that's the second issue that arises.

And the second issue is whether a mounting ring is the same as the -- the target support frame.  And we believe that they are the same.  They have the same function.  And again,

Dr. Lin is prepared to testify on that issue.

The bottom line is that the SMI reference is very relevant.  And I am mindful of this Court's concern about the trial date.  And, we have an anticipation of the Court granting our motion.  Not only this one, but the one that's scheduled for September 18th, with respect to amending the invalidity contentions.

Dr. Lin's expert report on invalidity sets forth the bases for invalidating the '266 patent on the basis of the Sputtering Materials, Incorporated reference, the SMI reference.  Those invalidity contentions are set out in Exhibit D of Dr. Lin's expert report, which was submitted and exchanged on August 28th of this year.

Being further mindful of the issues with respect to inequitable conduct, we have served -- although there is a dispute about the discovery, we have served our 30(b)(6) notice of deposition directly targeting these issues with respect to who had notice of this reference and who made the decision to withhold it.

Thirdly, we have prepared and had served Michael Fletcher's expert report --

**THE COURT:**  When is the proposed date of this 30(b)(6)?

**MR. CABELLO:**  Well, Mr. Clark and I have not been able to agree on whether I should be entitled to that

discovery, because of the deposition count, which I believe I don't -- I'm not at the limit.

But if I am, I think that discovery should be allowed liberally, because this is a new -- new cause of action, and one that I think is meritorious.

We have, in anticipation of the Court granting these motions, also had a patent law expert, Michael Fletcher, prepare and submit a report on inequitable conduct, focused on the SMI reference.

And the gravamen here, Your Honor, is that this patent was in the reissue/reexamination proceedings in the United States Patent Office. And the examiner rejected the claims. And those rejections went up on appeal. And they were reversed. The examiner was reversed, and the patent issued.

What happened, though, was that Lam was consistently telling the patent office that certain features regarding bonding did not exist. And in fact, those features are in the SMI reference.

What we have learned during discovery and after production of the SMI reference is that Mr. Degner, himself, in May of '88, attended Semicon West and made the observation that SMI was bonding a disk to a support frame using indium.

**THE COURT:** Using --

**MR. CABELLO:** Indium. Using indium solder.

**THE COURT:** Uh-huh.

**MR. CABELLO:**  And there's this argument that the SMI electrode is not a showerhead because it doesn't have holes. Well, that's all good and fine, Your Honor, but Claim 18 of the '266 patent doesn't require holes.

And, how do we know that?  Well, the doctrine of claim differentiation tells us that in Claim 19, there is a plurality of apertures.

So, the fact that Claim 19 requires a plurality of apertures suggests that there are no apertures in Claim 18. So when you look at Claim 18, all of the elements of Claim 18 are satisfied by the SMI reference.

The same applies to Claim 33.  SMI was manufacturing that electrode that is shown in the SMI brochure since 1988, when they appeared at Semicon West.  And so, Claim 33 goes to the process of manufacturing an electrode, and all of the limitations in Claim 33 are satisfied by the SMI manufacturing method.

Now, what we didn't know until we took Mr. Lenz's deposition is that SMI has the secret sauce to manufacture this electrode.

What do I mean by that?  Lam, to this day, does not know how to manufacture the indium-bonded electrode.  They send the graphite ring from Poco to SMI.  They send the silicon disk from Bullen, and the SMI people metallize the surfaces of both components, they flow indium solder on both of them, and then

they let them cool.

And so, once again, Lam didn't disclose how to practice this invention in their own patent application.  Why?  Because they didn't know how.

And, SMI's principal was very clear with me.  He said, "Those are my trade secrets.  I didn't tell them to Lam back in 1988.  I haven't told them to Lam until now."

And, that makes absolute sense.  Why?  Because to this day, SMI enjoys the benefit of Lam's revenue to make indium-bonded electrodes.

Now, there's been a lot of representations to this Court about what a great invention indium-bonded electrodes represent.  That may be.

But, it's not Lam's invention.  It's SMI's invention.  And SMI was the one that came up with the way to metallize surfaces, and to bond them using indium solder.

Now, there is another reference.  And it's not part of our pleadings, Your Honor, but it just goes to the affront by this Lam patent.

Lam also discusses in the '266 patent that the other way to bond a disk to a ring is to use metal-filled epoxies that help with the thermal and electrical conductivity.  Well, they learned that from Cominco.  A company called Cominco, C-O-M-I-N-C-O.

And, I do have a document which Mr. Clark produced after

the first of August of this year.  And that's the Cominco

reference.  And in Mr. Degner's own handwriting, that

reference shows -- says:

          "Semicon 588..."

     And in Mr. Degner's handwriting, he writes (As read):

          "Bonded to CU..."

     Which is copper.

          "...electrodes with silver-filled epoxy (for thermal

          and electrical and..."

     I'm sorry.

          "...for thermal and electrical transfer)..."

     And then he goes on:

          "...and then x-rayed for bond integrity."

     So between Cominco in 5-88 and SMI in 5 of '88, more than

a year before the application was filed, the inventors,

themselves, learned how to bond using indium solder, and how

to bond using metal-filled epoxies (Indicating).

     Now, if -- Your Honor, I have been practicing 30 years.

In the patent field.  And to be quite honest, Your Honor, I

don't know that I've ever seen a case that yells for

inequitable conduct, other than this case.  And I have been in

this field, as I say, for 30 years.  This is a case that never

should have been brought, if Rule 11 investigation had been

done.

     If Lam had dealt honestly with the PTO, not just once but

four times, they should have produced these references and should have told the patent office about SMI when they first filed the application.  They didn't.  They should have told them about SMI when they filed the reissue.  They didn't.  They should have told them about it, each time they falsified their responses to reexamination.  They didn't.  They should have told them in the course of their appeal.  They didn't.

And instead, they took positions which were contrary to what is disclosed in Lam.  They said -- I'm sorry, disclosed in the SMI reference.  They said, time and again, that the prior art fails to teach bonding, using this process.  That's just not the case.

So, Your Honor, I probably have gone longer than the Court intended, but I appreciate the Court's indulgence.

**THE COURT:**  Let me ask you about the practical question.  Given this schedule --

**MR. CABELLO:**  Yes, Your Honor.

**THE COURT:**  I know you've addressed this in terms of having anticipated this by providing invalidity contentions.  And, I guess Dr. Lin's expert report has been produced?

**MR. CABELLO:**  Yes, Your Honor.  Mr. Fletcher's, on inequitable conduct, it has been pronounced.

**THE COURT:**  Okay.  So in terms of the deadlines that I have set forth in terms of, for instance, expert discovery cutoff in advance of any dispositive motion work, that can be

accomplished, if, for instance, I allow you to amend and they then seek summary judgment on this question, on that -- arguing in greater detail that the SMI reference is not applicable, there's time to hear that.

MR. CABELLO: I believe so, Your Honor. Just to be clear with the Court, let me tell you what discovery is still pending, so that we have a clear idea.

There are two prosecuting attorneys outside -- I'm sorry, two outside prosecuting attorneys. And I'm making the distinction between in-house and outside counsel.

There is an attorney by the name of Mr. Heslin, who is now -- he was at Townsend and Townsend. He is at -- he is at another law firm in Palo Alto, Your Honor, and I can't recall the name of it. But, he has been served. His deposition was supposed to take place tomorrow. But, I understand that he has his firm retreat. And so we are trying to work out a date. I believe we have worked out September -- I'm sorry, the 17th of September as the date for Mr. Heslin's deposition.

The other outside counsel involved in prosecuting -- Mr. Heslin did the initial application. When it went into reissue, that attorney was a lawyer by the name of -- and just bear with me, Your Honor, I do have his name here. He is in the Virginia area. He has been served with a subpoena, and his deposition will go forward next week.

If I may pull out my calendar, I can look to see his name.

Just bear with me one second, Your Honor.

           **MR. CLARK:**  Mr. Skiff, Your Honor.

           **MR. CABELLO:**   Skiff.

      (Reporter interruption)

           **MR. CABELLO:**  S-K-I-F-F.

      So, Mr. Skiff is scheduled to be deposed next week.  My recollection is on next Wednesday, Your Honor, on the 10th of September.  And so, we have both prosecuting attorneys served, and basically we're ready to take their depositions.

      The only other deposition that we need is the 30(b)(6) with respect to the issues that Mr. Clark raises, the who, what, when.  We want to know who inside made the decision to withhold the references.

      What I did learn in taking the inventor's deposition is that the invention disclosure form which details SMI's involvement was sent to the prosecuting -- I'm sorry, was sent to their prosecution department.  I suspect that is an in-house prosecution department.

      I didn't get very far with Mr. Brandt, who's in-house.  But I think that a 30(b)(6) deposition notice will certainly shake that loose, now.

      Mr. Clark and I have had some discussions.  He refused to designate anyone under the 30(b)(6).  And then after Mr. Brandt's deposition was concluded, he said, "You should have asked Mr. Brandt all those questions about..."

And I said, "Well, you didn't designate him."

And I want to make sure I get the company's testimony, not Mr. Brandt's testimony. So, I'm sure you will hear from Mr. Clark about that.

But, suffice it to say that the opening report has been served. The bases for inequitable conduct are clearly laid out in that. There is no surprise. And that is the representations that were made to the PTO by Mr. Skiff in connection with characterizing what wasn't in the prior art, when it clearly was, with respect to the SMI records. And so, I don't believe that we will disrupt the calendar.

Secondly, I want to inform the Court -- and I've been whipping my boys pretty hard back in Houston, but I have their commitment to me that they will complete the motion for summary judgment of invalidity based on the SMI reference, and that we will be able to file that with the Court by Wednesday of next week.

And so, Your Honor, I hope to meet that commitment. But I will commit to this Court that we will file it without a doubt by the at the end of next week. But I do hope --

THE COURT: In any event, it will be heard by or in advance of the last day to hear dispositive motions, which is 11-20.

MR. CABELLO: That is correct, Your Honor. It should be fully briefed, and ready to be heard by then. We will file

it next week, without a doubt.  We want to get that in front of the Court, because we truly believe that the SMI reference is on all fours.

And, given that this Court only allows one motion for summary judgment, there are a lot of other issues that I think are appropriate for summary judgment.  Certainly, this willfulness issue we believe can be decided as a matter of law, given the fact that the -- we don't believe that the objective prong can be met.  And of course, as the Court knows, if the objective prong can't be met, it doesn't go to the jury.  Unfortunately, that's not a case-dispositive motion.

We believe that the SMI reference is a case-dispositive motion, and we will file it as a case-dispositive motion.

**THE COURT:**  All right.

Let me hear from you.

**MR. CLARK:**  That's an awful lot of talking for me to respond to, Your Honor.

First of all, with regard to depositions.  We are going to do the Heslin deposition, but not on the 17th.  I have no knowledge of us having agreed to that date.

The 30(b)(6) deposition, the discovery cutoff is past, Your Honor.  And the notice of -- 30(b)(6) notice was dated something around the -- around the 20th of August, I think it was.  And it set a deposition for the 12th of August.

So, there was no need to move to even quash that deposition because --

**THE COURT:**  Well, yeah, unless I grant leave in view of the timeliness of the disclosure of the SMI document.

**MR. CLARK:**  Your Honor, as far as the SMI document is concerned, we, of course, disagree entirely, for the reasons stated in the brief.  That's a sputtering device.  The --

**THE COURT:**  What does that mean?  What is a sputtering device?

**MR. CLARK:**  Well, Your Honor, as I understand it -- and I'm not technical -- as I understand it, sputtering is a method whereby you create a wafer by causing material to be spun off the sputtering target.  So if it's an aluminum sputtering target, it deposits material from the sputtering target on to the wafer.

Whereas with an etch, with a plasma etch, the target is etched, not built up by material that's deposited on the sputtering.

Now, on that regard, Your Honor, even though Dr. Lin is here, I think it's inappropriate on a motion to be calling expert testimony, especially without --

**THE COURT:**  And, I'm not going to hear expert testimony now.

I think the question in my mind is:  Is this so obviously futile that we shouldn't even get to that point?  Or, is this

something that should await summary judgment, trial, or a more effective adjudicatory process?

Does it pass the initial plausibility test?

MR. CLARK: Well, Your Honor, they're both -- both methods whereby a wafer can be -- can be created. So, although they're different methods, and the differences are very subtle and technical -- I wouldn't pretend to begin to understand them.

But certainly -- for example, one of the standard differences is the electrode plate in the plasma system has holes in it, and must have a lot of holes, because it has to distribute the gas evenly within the chamber.

The SMI reference doesn't have holes in it. And it seems, as I understand it, most sputtering targets don't have holes in them, either.

Now, they've given you an example of a sputtering target which has a hole, which, there's some patent on that. My understanding is that that is not the usual way.

But certainly, for today, we are not going to decide that issue, Your Honor. You needn't enter into any of the issues that were discussed by Mr. Cabello.

The question is: What is the adequacy of the pleading? And if you look at the adequacy of the pleading, it simply doesn't -- doesn't meet muster under the *Exegen* (Phonetic) case. There is no who, there is no what, there is no when,

there is no when (sic), there is no how.  And, the --

**THE COURT:**  Well, assuming that's true, now, with the briefing, it is evident to me that they know more about the who, especially with the tying the SMI publication to Mr. Degner.

They have asserted that they're going to claim that the publication teaches each and every limitation of at least Claims 18 and/or 33 of the '266.  They're going to have charts; they've already provided invalidity contentions.

So I could say, all right, maybe this doesn't meet the specificity requirements, but I can give leave to amend because there's a clear indication of what that amendment will do in terms of greater specificity.  So, I don't know how that changes the fundamental dynamics of this.

My question is:  Should we even go down this road?  And my concern, again, is:  What's going to happen?  How is this going to impact on the schedule and structure of this case?

**MR. CLARK:**  Your Honor, that's -- that's the problem, Your Honor.  Let's say you give them 30 days to amend, and they do amend, and it's assumed that they get it right this time and they actually provide the specificity.

Are we going to have more discovery about the new allegations?  Are you going to reopen discovery for that?

I mean, are you going to reopen discovery even for them to determine the questions that they want to ask in the 30(b)(6)

notice that was dated the date before it was served?

So, we're about to head in -- as it is, Your Honor, we have a lot of fact discovery that's taking place.

**THE COURT:** We can delimit that right now. I mean, you've already indicated exactly what you want. And I could say, "All right, that's it."

Plus, you're going to amend your complaint, just -- at least for the Record, to make it clear. Even though you've had invalidity contentions I guess propounded, and you've got expert reports, et cetera, et cetera, I think that's a fair thing.

But that's not going to open the door. You can't use that to leverage more discovery: "Well, I'm now going to amend it to include X, Y and Z; now I need..."

We can say, given this case schedule, these three depositions -- the two prosecution attorneys and the 30(b)(6) -- is it. You have to go with it. You've got your report, your initial report already done. We're in time now to tee this up for summary judgment within the time frame that's in keeping with my CMC order.

And so, it seems to me, you know, we can still stay within the time frame that I set forth for the trial.

**MR. CLARK:** So, Your Honor, I mean, are you suggesting that Xycarb gets to do discovery, and Lam doesn't?

**THE COURT:** Yeah. Because they're not exactly

symmetrical.

**MR. CLARK:**  But, there is sufficient symmetry that we ought to be able to ask --

**THE COURT:**  How can you do discovery against a party that hasn't even been brought in yet?  It's like apples and oranges.

For one thing, you had inquiry notice about BV.

**MR. CLARK:**  I'm not talking about that, Your Honor.

**THE COURT:**  Oh.

**MR. CLARK:**  I'm talking about new allegations are going to be made against Lam within the next 30 days.  Are we precluded from --

**THE COURT:**  Well, then, let me hear from you what kind of discovery -- knowing what you know now, what they say that -- if they had to amend the complaint, the specificity about Mr. Degner, how the SMI publication teaches each of the limitations in Claim 18, knowing all that -- let's say that's in there right now, they amend it tomorrow.  What discovery would you need?

**MR. CLARK:**  I would need a 30(b)(6) with respect to all of -- to each element of the -- of the inequitable-conduct claim.

And I would need -- and because witnesses sometimes are evasive, I would need an interrogatory response, interrogatories, so that somebody could be forced to commit on

behalf of the company exactly which -- which person allegedly had the knowledge, and the intent to --

THE COURT:  Well, that's like a contention interrogatory.

MR. CLARK:  Well, it is.

THE COURT:  That's not a fact-based -- you're not -- it's your alleged -- your client's alleged inequitable conduct.  So, I don't know -- you want to pin them down in terms of preparing for trial, and pinning them down.  That's all through the trial process.  That can be done through the disclosures at trial, and the witness summaries and these sort of things.

If you want something in advance, I might give leave to -- maybe it's a fair thing to say pin your contentions down now. I mean, maybe they're already there, because you've got invalidity contentions.  I don't know how much more you need than that, but I mean, if you need some specificity in that, I can entertain that.  But, I think that can all be done when this time frame.

MR. CLARK:  Well, the invalidity contentions are all boilerplate, Your Honor.  They really are.  There's specific -- you know, who was it -- and it's not just one person, because it's the person -- who had knowledge of this SMI thing?  Who withheld it with intent?

THE COURT:  That's why they need these depositions.

Once they take the depositions, maybe it will tell you that.

**MR. CLARK:**  No, that's why there needs to be discovery both ways, Your Honor.  There can't just be discovery one way.

**THE COURT:**  What fact discovery -- besides contention-type discovery, what fact discovery do you need?

**MR. CLARK:**  I would ask them exactly what facts they rely on in support of their case.

**THE COURT:**  That's contentions.  "Name every fact, identify every fact, every document that you contend support the allegations of blah, blah, blah."  That's a contention interrogatory.

**MR. CLARK:**  I wouldn't put the bit about every fact that supports --

**THE COURT:**  Contention interrogatory.

**MR. CLARK:**  I would say "every fact," not "every fact that supports the contention."

**THE COURT:**  Okay, but that's a contention interrogatory.  Do you have a -- is there a witness that you need to depose, given this new defense?

**MR. CLARK:**  I don't know.  I've had the defense for two weeks, Your Honor.

**MR. CABELLO:**  Your Honor, may I be heard on this?

**THE COURT:**  Yeah.

**MR. CABELLO:**  I really don't see the need for a

Xycarb witness.  What we have here is a document that was withheld by Lam for -- ever since 1990.  It was just recently produced.

All information related to that document is in Lam, unless Mr. Clark is going to be depose his own witnesses.  And his own client.

THE COURT:  I get that.  That is why I just said that.

MR. CABELLO:  Thank you, Your Honor.  Sorry.

THE COURT:  So, I have -- so, let's move on.  I'm going to allow -- grant leave to file an amended complaint.

However, to the extent now that you've added things in your reply and other things, I think, for the Record, it is fair to make a clearer position in your amended answer and counterclaim.

So I'm going to give you -- and I'm going to make this short -- just 14 days to file a further amended answer and counterclaim, to put that kind of specificity that you now have, that you have fleshed out in your reply and in your briefing, that should be in the pleading.

MR. CABELLO:  Your Honor, if I may just request that the Court set this, based on when I get Lam's 30(b)(6) representative to answer questions related to the notice that's already out there.  Because Mr. Clark can drag that out beyond 14 days, and I'm not going to have the information I --

**THE COURT:** All right, let me address the 30(b)(6).

And, I'm going to allow the 30(b)(6) deposition, even though it is past the discovery cutoff, because of the timing of the disclosure of the SMI materials. I think it is a fair request, and a good-cause basis to extend the deadline with respect to that deposition.

And I'm also going to make clear that I'm delimiting the -- the Defendant's discovery universe to what you have said. And those are the two prosecuting attorneys that you need to depose, and the 30(b)(6) deposition. And I think it is appropriate.

So that's what's authorized, and I'm going to order those to go forward. And those ought to be completed quickly.

**MR. CABELLO:** Yes, Your Honor.

**MR. CLARK:** Your Honor, may I just speak to that?

**THE COURT:** Yeah.

**MR. CLARK:** The 30(b)(6) notice that has been served us is incredibly over-broad, and inappropriate. And I -- if you --

**THE COURT:** I haven't seen that, so what I would like you to do is meet and confer. It should zero in on exactly what we're talking about.

If there's a way to narrow it and you reach a stipulation, knowing that I have blessed in large part the concept of a 30(b)(6) deposition geared to this new inequitable-conduct

defense, I would hope you could work that out.

If you can't, submit to me then your competing positions, and I will resolve that. But I want to resolve that quickly, within the next couple of days.

And I think you ought to then really schedule this deposition within the next two weeks.

**MR. CABELLO:** Very well, Your Honor.

**THE COURT:** And then I'll give you three weeks to file your amended amended complaint. I guess it would be your -- is it third, or whatever -- second amended answer? I don't know what it is.

**MR. CABELLO:** It will be a second amended answer, Your Honor.

**MR. CLARK:** Your Honor, how, mechanically -- if we can't reach agreement, how, mechanically, would you like us to submit this issue to you? A brief?

**THE COURT:** A joint letter to me, just briefly explaining, you know, your position, and then just have the Exhibit A and Exhibit B, the list of topics.

**MR. CABELLO:** Unfortunately, I don't have the notice, Your Honor. Otherwise, I'd offer it up. I just don't have it with me.

**THE COURT:** Okay. Well, I'm hoping that you all can work it out, and I won't be seeing a joint letter. But if that's the case, I'll resolve it one way or another.

**MR. CABELLO:**  Your Honor -- and, I apologize for bringing this up at this late juncture.  We are set on the calendar for September 18 for the motion for leave to amend the invalidity contentions to add SMI.

Given the Court's ruling today, I'm wondering if --

**THE COURT:**  That is moot at this point.  Now that I've granted it, and you've already -- you've got it there, there's no sense in our wasting time.  My main point is it should be amended.  You have amended it.

**MR. CABELLO:**  (Nods head)

**THE COURT:**  And you may have to amend it again, I don't know, if you get more stuff.  But, we need that in order to move forward.

So, that issue is moot.  I'm granting that motion.

**MR. CABELLO:**  Thank you, Your Honor.

**MR. CLARK:**  The September 18th motion, Your Honor?

**THE COURT:**  Yeah.  So, that's taken off calendar at this point.

(Off-the-Record discussion between the Court and Clerk)

**THE COURT:**  Then we had a status set, and we should move that to a date that -- well, we're going to probably see you for the -- you've got a motion for summary judgment; you probably will have a motion for summary judgment, is my guess.

**MR. CABELLO:**  Your Honor, if I may?

**THE COURT:**  Yeah.

MR. CABELLO:  I believe that Mr. Clark has used up his --

THE COURT:  Oh, that's right, he has.  So he's going to oppose your motion, obviously.

MR. CABELLO:  I have no doubt he will.

THE COURT:  I assume he will.  And that's how we're going to adjudicate this issue, rather than putting your expert on the stand today.

I'll set a further status conference for November 20th, which is the date, last day to hear summary judgment.  But if you notice it for an earlier date, you advance it, I'll consolidate that for the next status conference.

MR. CLARK:  I'm sorry; I missed the date, Your Honor?

THE COURT:  November 20th, subject to it being consolidated with the hearing on the summary judgment.

THE CLERK:  So, Counsel, it will be at 1:30 in the afternoon.

MR. CLARK:  Thank you.

MR. CABELLO:  Your Honor, the Court's order is to submit a -- I forget what it's called, Your Honor; I'm sorry.  Basically, a report on our status.  I believe that's due next week.

Does the Court --

THE COURT:  That's going to be vacated.  So it'll be a week in advance -- I'm going to vacate next week's status

conference, in favor of the one in November.

**MR. CABELLO:**  Thank you.  But there's a report due, a status report due.

**THE COURT:**  One week.  That's kind of a --

**MR. CABELLO:**  And we're going to vacate that also?

**THE COURT:**  Yeah.  But instead, you'll file something a week in advance of the now more current status date.

**MR. CABELLO:**  Understood, Your Honor.

**THE COURT:**  Okay.  All right.  So, just to reiterate, we are going to trial, March 2nd.  We have got a pretrial conference February 3rd.  And, I'm determined not to allow those dates to slip.  They just can't slip.  I don't have any other dates available.

And so, let me just ask.  I know this is not a status conference, but I always ask the question in terms of ADR.  I know you've had some efforts in the past.

Is there a juncture at which it makes sense to go back to the table?

**MR. CABELLO:**  Your Honor, I'm a strong believer in ADR, and in fact, my first involvement with this case was sitting in the back of the courtroom behind the bar, listening to arguments at the claim construction hearing.  And then after that, I entered the case, actually, without the knowledge of litigation counsel, and with Mr. Clark, scheduled a mediator and a mediation date at the request of my client.

We were unsuccessful, before Judge Ware.  The parties were too far apart.  At that time, Plaintiffs' demand was -- opening demand was in the 10 to 15 --

THE COURT:  I don't need to know -- I don't want to know --

MR. CABELLO:  I'm not talking about settlement, Your Honor.  I'm talking about their damages demand.

THE COURT:  Oh, okay.

MR. CABELLO:  Their damages demand was in the -- 10 to $15 million.  We were too far apart.  It turns out that their expert report on damages now came in at an $8 million number.  So, the gap has closed a little bit.

Whether we can settle it or not, Your Honor, I don't know.  But I'm certainly willing to enter into any discussions that Mr. Clark may want to enter into, or that the Court may direct.

THE COURT:  All right.  Any thoughts?

MR. CLARK:  Your Honor, we are about to spend an awful lot of money on experts over the next --

THE COURT:  That's why I asked.

MR. CLARK:  -- few months.  And if there could possibly be a way to possibly resolve this case, we will certainly take it.  I'll take up Mr. Cabello's invitation and see if it's worth pursuing.

I should tell you that Judge Ware a few weeks ago

approached us, and asked us if he could be of more use.  And, Mr. Cabello had to respond first, and said, "We'll see how things who work out over the next few weeks."

But obviously, I think time is of the essence because we're probably going to spend upwards of a half a million dollars in the next month or so.  And if we can possibly resolve this case, it will be to everybody's advantage.

**THE COURT:**  I agree, and which is exactly why I asked.  Because you're about to jump off that precipice now, and into the deep abyss.

So, Judge Ware is available to you, it sounds like, if you want to go back to him.

**MR. CLARK:**  Yeah, we sort of put him on hold for the time being, Your Honor.

**THE COURT:**  All right.

**MR. CABELLO:**  I don't know what his availability is, but he seemed willing to reengage whenever we wanted him to reengage.

**THE COURT:**  Well, I think this is a time -- and I would urge you to go back to your clients and make sure they understand the dynamics, the costs, the time and everything -- this is a window right now.  And I wholeheartedly endorse that.

If, for some reason, Judge Ware is not available and you can't find another private mediator, you know, we do have

Magistrate Judges here, many of them very experienced in the intellectual property area. But, so, whatever we can do to be of help in that regard, I want to make sure you are aware of that.

MR. CLARK: Your Honor, I wasn't going to raise this issue, but there is a timing problem.

If -- would you extend the dates for rebuttal expert reports? It won't affect the timing of the case, but it will give us a breathing space to -- to see Judge Ware or one of the Magistrate Judges. Because right now, Your Honor, we have a hectic calendar. A hectic calendar.

THE COURT: Yeah.

MR. CLARK: We have depositions. I have a deposition in Holland. Frankly, there's no time to meet with Judge Ware.

THE COURT: I don't have a problem, as long as it doesn't change the summary judgment date. So, if you don't -- if you can -- it really comes off your time.

That is, I don't know whether you need rebuttal reports in order to file your -- well, you've already said you're going to file your motion in a week, anyway.

MR. CABELLO: Yes, Your Honor.

THE COURT: It doesn't sound like your motion is going to be contingent on rebuttal reports.

MR. CABELLO: It's not, because it is a motion for summary judgment of invalidity. We have advanced our

invalidity contentions.

Certainly, we expect to see their invalidity contentions, but we will -- we'll either see them in response to -- I'm sorry.  We'll see their rebuttal to our invalidity contentions either in a MSJ response or in their reimbursement reports. It would be nice to see them in a rebuttal report, and we did want to see them.

But, we do need -- I would like to get the Court's guidance on a couple of additional issues, Your Honor.

**THE COURT:**  Let's talk about the rebuttal thing.  To the extent that moving, slipping that deadline to give you a chance to revisit with Judge Ware or whomever you like, I think that's worth the -- even though it compresses at the end, it gives -- you have a chance before you jump into that.

**MR. CLARK:**  It will save a huge amount of money, Your Honor.  And I think that will go a long way to helping a settlement.

**THE COURT:**  All right.  So if I change rebuttal report date to, let's say, you want two weeks, that's October 2nd.

And, then, discovery cutoff, if we move that by two weeks for expert discovery, that gets you to the 23rd.

**MR. CABELLO:**  I'm sorry; the date again for rebuttal reports, Your Honor?

**THE COURT:**  October 2nd.

**MR. CABELLO:** October 2nd.

**THE COURT:** And then, expert discovery would be the 23rd, correspondingly.

**MR. CABELLO:** October 23rd?

**THE COURT:** October 23rd.

**MR. CABELLO:** All right.

**THE COURT:** But that would not change your summary judgment -- sounds like that's not going to change, anyway. You're moving forward on that, and that's going to happen.

So, so, I'm happy to move those two dates.

**MR. CLARK:** Thank Your Honor.

**MR. CABELLO:** Your Honor, if I may seek the Court's guidance on a couple of issues?

**THE COURT:** Yeah.

**MR. CABELLO:** We've had some issues relative to the damages discovery. And, Plaintiffs are seeking lost profits. It's their burden of proof under *Panduit* to establish capacity; it's their burden of proof to establish a number of factors. But, key to this is capacity.

Dr. Napper, the expert for Lam, served his opening report. And in his expert report, he says, "I don't have this information, I don't have this information, I don't have this information."

That's all information in Lam's control. It's the same information that we have been asking Lam for, because we

needed it for our expert reports.

Now, I appreciate the Court extending the rebuttal report deadline.  But we need to make sure that the -- that the whole process is not perverted.

Now that Dr. Napper has given us his expert report and now that it's clear that Lam should have produced the information that we have been asking for, that they didn't, that Dr. Napper needed and didn't have, to the extent that there are more documents, we don't believe that Dr. Napper should be given the opportunity to supplement his report on the basis of information that has been in Lam's custody and control all along.

And so, we have a deposition scheduled of a company by the name of Bullen next week, which I agree that should -- to permit to go forward.  Bullen is the supplier of silicon disks that are used in this electrode.  And what Lam wants to do is obtain from Bullen information related to capacity.

Now, Xycarb noticed Silfex's/Bullen's deposition, in Ohio.  Went and took that deposition.  Lam didn't show up.  They didn't send an attorney to that deposition.  And now, they want to backfill that information, go get capacity information from Bullen, and then give it to Dr. Napper so he can supplement his report.

We think that's wholly inappropriate.  We think it is inappropriate because this information has been in Lam's

control all along.  Lam bought Bullen, they bought and -- it became Silfex in the process.  But all this information, they have had all along.  And they haven't produced it.  Even though we have been begging for it.

And so, not only should Dr. Napper not be permitted to supplement his report based on information that they failed to produce before Dr. Napper filed his opening report, but we don't believe that Lam should be able to rely on anything they produce after discovery cutoff at time of trial.

MR. CLARK:  Your Honor, I have no idea what information he's talking about.

MR. CABELLO:  It is --

THE COURT:  Well --

MR. CLARK:  If I could be told, then I could respond.

THE COURT:  Well, let me put it this way: Essentially what you're asking for is that -- no supplementation of expert reports.

Expert reports perform a function.  They delimit what's going to be testifiable at trial.  And that is the starting presumption.  That is a default position.

Now, sometimes you can amend.  You can supplement a report, for good cause, sufficient cause.  If there's something that was not -- and you know, my guess and I would have to look at the law, if you guys, you know, bring this to me, but my guess is that there's going to be a question of

diligence, cause, you know, to supplement a report.

But we can't have people filing reports: "Oh, yeah, I thought of something else, by the way, you know, three weeks before trial, and here's my supplemental report.  I've decided to conduct another experiment."

I've had this before.  People, you know, submit a report, and they decide to conduct some more experiments.  Now they've got new data points.  And I said, "No.  If you could have done it then, you've got to do it.  That's why we have dates."

So, I'm not going to prejudge this.  I don't know what the nature of it is.  You're asking me to make a judgment in advance, to preempt and rule out any further supplementation of an expert report.

I'm not going to do that, other than to indicate that yes, these dates are serious dates.  And supplementation is not to be given so liberally that these dates don't mean anything, because everything hinges on that.  We're running a railroad straight to trial right now.

**MR. CABELLO:**  So, let me give you a couple of examples, Your Honor.

On the day before discovery closed, Lam produced close to 2,500 documents, new documents.  Dr. Napper at Page 4 of his report says (As read):

"I understand documents have been produced in the days leading up to this report..."

He's not talking about Xycarb documents.  He's talking about Lam documents.

"...and including the date this report was issued."

Then he goes on:

"I further understand documents were produced with Bates..."

(Reporter interruption)

**MR. CABELLO:**  (As read)

"I further understand documents were produced with Bates stamps corresponding to some of the documents I have cited by name throughout this report within the last day or two.  Given the late production of these documents, I have not had the opportunity to provide the Bates number of every citation in this report."

Then he goes on, and he says -- just bear with me, Your Honor:

"As of..."

This is at Page 23 of Dr. Napper's report (As read):

"As of the date of this report, I have been requested by counsel to assume that the manufacturing capacity of Bullen from 2000 to 2005 prior to Lam's acquisition of the company in late 2006 was equal to the capacity available in 2006 when Bullen was acquired by Lam, but before Lam expended its electrode manufacturing facilities."

Now, that assumption has to be backfilled with facts. They don't have the facts.  It was their duty to go get those facts.

And so, my only point, Your Honor, is that this Court has admonished us to be liberal in discovery.  If he wants to go take Bullen's deposition, then so be it.

But, my agreement to let him take Bullen's deposition is not an agreement to let him use the Bullen information to supplement Dr. Napper's report when that information was in his custody and control all along.

**THE COURT:**  Well, Doctor -- this doctor will be able to testify as to what he saw at the time of the report, and -- and reiterate that at trial.  What he can't do is supplement that with after-the-fact discovery.

Now, whether or not Lam can bring in through another witness predicate facts that support the assumption that Dr. Bullen made, you know, that may be -- that may be permissible.  Because you're going to want to impeach that -- just as you'd want to impeach an assumption of an expert, saying, "Well, weren't you aware of X, Y and Z, that you didn't take this into account," they can certainly come back and say, "Well, wait a minute, we've got A, B and C."

So his assumption that underlies his opinion may be bolstered, but he can't testify to it because he didn't see it.  So, that's the way it's gotta work.

**MR. CABELLO:** Very well. I was just seeking the Court's guidance because we are trying to cooperate with each other about discovery after the discovery cutoff. But, that has its limits.

I mean, the opening reports have been served. And, to the extent that Xycarb had information, didn't produce it, their experts can rely on it, and we shouldn't be permitted to later supplement, based on information we didn't turn over.

The same should apply to Lam. They had information. They didn't turn it over, or they produced it the day before discovery cutoff. The expert reports got submitted. If it's not in there, so be it. It was their information. They should have produced it.

**THE COURT:** As I said, the expert report is the expert report --

(Simultaneous speakers)

(Reporter interruption)

**THE COURT:** The expert report is the expert report, and that's what's going to guide me.

You may go ahead.

**MR. CLARK:** Thank you, Your Honor. Because now, there's been accusation against Lam of hiding information.

What happened is that throughout their investigation and throughout the time they prepared their report, the experts were -- because they were a group of them working with

Mr. Napper, were constantly seeking information from within Lam, from without Lam, all over the place. And they very correctly, properly said that they weren't going to rely on any document that hadn't been produced to the other side.

And it turned out that when the report was about to be delivered, that there were certain documents that had not been Bates-numbered that they had. So, we made sure that, together with -- at least by no later than service of the report, every single document that the experts had access to were produced to Xycarb. Whether or not they were requested.

But, we made absolutely certain that everything that the experts had access to was produced. And that was the reason for that production at that time. They were gathering documents right up to hours before they completed their report.

**THE COURT:** Well, all right. I'm not going -- there's nothing for me to resolve at this point, other than indicating what I've indicated. And that is: The expert reports count, the timing of those expert reports count, as well as the content. That is going to be the guide as to what can be testified to at trial.

Whether other evidence produced thereafter can be introduced as a way of, quote, backfilling, they can't be done directly through the expert, but I'll have to wait and see whether there is a way that can come in independently.

**MR. CABELLO:**  Your Honor, there is one other issue.

**THE COURT:**  What's that?

**MR. CABELLO:**  This is on the asserted claims.

As you are well aware, Your Honor, the District has local rules that the infringement contentions be exchanged early on. They were.  There was a good number of claims that were asserted at that time.

Lam has served its expert report by Dr. Glew.  And only a limited number of claims were recovered by Dr. Glew, with respect to infringement.

I've reached out to my colleague, and said, "Does that mean you're not asserting the other claims?"

There's no expert report to support that.  We spent a lot of money battling all of the claims.  Now it turns out there's only a subset in Dr. Glew's report.

So I've reached out to my colleague and said, "What are you going to do with the other claims?"

And he says, "Well, I don't know yet."

Your Honor, I'd like to get them out of the case.  I don't know whether the Court would like to deal with it in a motion to dismiss, but there's certainly no infringement report on a lot of the claims that were initially in the infringement contentions.  We think they should be out of the case.

**THE COURT:**  All right.  What's happening on that front?

**MR. CLARK:** Your Honor, the expert did only deal with certain of the asserted claims. The asserted claims are the asserted claims that were exchanged. Some of those claims will not be asserted.

But, I'm not going to, on 24 hours' request from Mr. Cabello, make a final decision as to what claims are going to be asserted or not. Some of those claims don't need expert testimony.

The dependent claims, for example, say, talk about a dimension of an electrode disk. Anybody -- you don't have to be an expert to determine the dimensions of an electrode disk. So, there are certain claims that don't need expert testimony. And those are still in the case.

Now, certain claims, like Claim No. 1, claims a reactor, which is the actual device in which the plasma etching takes place. We won't be asserting that claim. We will probably not be asserting any of the reactor claims.

But, for Mr. Cabello to send me an email and ask me to abandon claims, I'm just not going to do it, Your Honor. I want to think about it first.

**THE COURT:** Well, let me put it to you this way: When you file your pretrial statement, certainly by that point it should be clear what's going to trial. And that's due 21 days prior to the pretrial conference. And you're going to meet and confer some 42 days, I think, in advance. So there's

going to be some discussion, at the very least, at the very latest, by that date.

Second, to the extent that there are claims that were brought, and sort of held, and then decided at the last minute that they're not to be asserted and they're essentially dismissed from the case when they could have been dismissed earlier, I think your client risks the incurrence of fees.  I mean, we're in a whole new frontier now, in terms of fees.  But, I'd have to look at that.

And so, all I can say is I would encourage you to cooperate.  And if -- and, and, and rather than wait until three weeks before the pretrial conference, sometime in advance make clear what's going trial and what's not.  Because if time and money is spent on something that is not going to go to trial, and -- and depending on the outcome of this case, that may factor into issues of cost and fees.

**MR. CLARK:**  I understand that, Your Honor.  I'm not trying to stonewall here.

Just that, those are -- those infringement contentions were submitted in 2010.  Ten days ago, we discovered that it was going to be an inequitable-conduct expert submitting a report.  That was the first we heard of it.  And, he did submit a report on all of the asserted claims.

But, if we had been given a little bit more notice than ten days, and requested to go through that, or if we had been

given more than 24 hours notice by email from Mr. Cabello to finalize what our claims are going to be, we could have addressed it.

But we had no idea that they were going to have an inequitable-conduct witness submit a report on all of the asserted claims, from 2010, without --

THE COURT:  Right.  But, even apart from asserting an inequitable-conduct report on the asserted claims, I think what Counsel's asking for what -- on the affirmative side, putting aside the defense, which of the claims are actually going to go to trial.

MR. CLARK:  Yeah, that's a fair question, Your Honor. And if I'm given more than 24 hours, I'll answer it.

THE COURT:  All right.

MR. CABELLO:  Your Honor, just to be clear, Dr. Glew's report -- that's Lam's opening expert -- his report covers Claim 18, which is independent; Claim 19, which is dependent --

(Reporter interruption)

MR. CABELLO:  Claim 18, which is independent; Claim 19, which is dependent; Claims 22 and 23, which are dependent. And those are the ones -- 22 covers dimensions, the diameter, specifically.  And 23 covers the width.  Again, dimensions.

Claim 26 is also a dependent claim.  Claim 30 is another dependent claim.  And then 33, which is independent, and Claim

36, which is dependent from 33.

MR. CLARK:  Can I look at that?  Is that it?

(Request complied with by Mr. Cabello)

MR. CABELLO:  My point, Your Honor, is that -- my only point, Your Honor, was that there are claims that are covering dimensions included in Dr. Glew's report.  And that's fine.  We'll defend against those.

But, but there's other claims that were covered in the infringement contentions which are missing from Dr. Glew's report.  And so --

THE COURT:  Let's do this.

MR. CLARK:  Can I just give you one example, Your Honor, of one of those that I -- 29.  "An electrode assembly..."

(Reporter interruption)

THE COURT:  All right.  We're almost done.

MR. CLARK:  One of those, Your Honor, is 29.  It's (As read):

> "A electrode assembly as in claim 24, wherein the
> bonding layer is substantially free from voids and
> has substantially uniform electrical and thermal
> conductivity..." (sic)

(Reporter interruption)

MR. CLARK:  "Electrical and thermal conductivity..." And so, that is one that we haven't abandoned, but the expert

didn't address, because there's undisputed evidence --

**THE COURT:**  Is there any problem with, the last day that we're going to hear summary judgment on November 20th, at least by that date, deciding and indicating which of the claims you are going to go forward on, affirmatively?

**MR. CLARK:**  No problem, Your Honor.

**THE COURT:**  Let's just do that.  And then, that way, we have clarity.

Okay.  I think that concludes what we need to do today.  Right?

**MR. CLARK:**  Thank Your Honor.

**MR. CABELLO:**  Thank you, Your Honor.

**MR. CLARK:**  More time than we deserved.

**THE COURT:**  Well, I think the court reporter has given more time than is due.

So, we will see you back either on the 20th, or whatever the date is for the hearing.  Okay?

**MR. CABELLO:**  Thank you.

**MR. CLARK:**  Thank you.

**MR. CABELLO:**  Thank you very much, Your Honor.

**THE COURT:**  Thank you.

Oh, if you do want a Magistrate Judge, if for some reason you decide that -- you know, Judge Ware is not available, let me know.  If you have a preference of a particular judge or whatever it is, I'll work with you the best I can.

But whatever it is, I would urge you to go back, and I will want to hear at the next status conference what you've done in terms of ADR.

**MR. CABELLO:**  Very well.  Thank you, Your Honor.

**MR. CLARK:**  Thank you.

**THE COURT:**  Thank you.

(Proceedings concluded)

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373-2529

**CERTIFICATE OF REPORTER**

I, BELLE BALL, Official Reporter for the United

States Court, Northern District of California, hereby certify

that the foregoing is a correct transcript from the record of

proceedings in the above-entitled matter.

*/s/  Belle Ball*_____

Monday, September 13, 2014

Belle Ball, CSR 8785, CRR, RDR